**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
(Southern Division)

| | |
|---|---|
| **MICHAEL RAGAN**<br>22664 Kinnegad Drive<br>Great Mills, Maryland 20634<br>(St. Mary's County)<br><br>– Individually and on Behalf of All Others<br>Similarly Situated –<br><br>**Plaintiff,**<br><br>v.<br><br>**FARFETCH LIMITED**<br>The Bower<br>211 Old Street<br>London EC1V 9NR<br>United Kingdom<br><br>**JOSÉ NEVES**<br>c/o The Bower<br>211 Old Street<br>London EC1V 9NR<br>United Kingdom<br><br>**ELLIOT JORDAN**<br>c/o The Bower<br>211 Old Street<br>London EC1V 9NR<br>United Kingdom<br><br>**STEPHANIE PHAIR**<br>c/o The Bower<br>211 Old Street<br>London EC1V 9NR<br>United Kingdom<br><br>**Defendants.** | Case No.<br><br>**CLASS ACTION<br>COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Michael Ragan ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Farfetch Limited ("Farfetch" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Farfetch securities between March 9, 2023 and August 17, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Farfetch, together with its subsidiaries, operates a global platform for the luxury fashion industry. In addition to revenue, one of Farfetch's most important financial metrics is gross merchandise value ("GMV"), which the Company defines as the total dollar value of orders processed, inclusive of product value, shipping, and duty, and net of returns, value added taxes, and cancellations. According to Farfetch, the Company's GMV closely correlates with its revenue.

1

3.    Farfetch's largest markets include, *inter alia*, the U.S. and the People's Republic of China ("China").  Despite recent softness in those markets, the Company assured investors during the Class Period that, as of the first quarter ("Q1") of 2023, those markets had either recovered or were recovering and were expected to drive future revenue and GMV growth, particularly in the second quarter ("Q2") of 2023.

4.    In May 2023, Farfetch announced the commercial launch of its European partnership with footwear and clothing brand Reebok International Limited ("Reebok").  Reebok's owner, Authentic Brands Group, partnered with Farfetch in 2022 to operate its business in Europe, re-platform its European e-commerce sites, and drive the evolution of the brand by expanding its luxury collaboration offerings globally.

5.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Farfetch was experiencing a significant slowdown in growth in the U.S. and China; (ii) Farfetch also faced onboarding challenges impacting the launch of its Reebok partnership; (iii) Farfetch downplayed challenges it faced with respect to, and/or overstated its ability to manage, its supply chain and inventory; (iv) all the foregoing was having a significant negative impact on Farfetch's revenue and GMV growth; (v) accordingly, Farfetch was unlikely to meet market expectations for its Q2 2023 financial results or its own FY 2023 revenue guidance; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.    On August 17, 2023, Farfetch issued a press release announcing its Q2 2023 financial results.  Among other items, Farfetch reported revenue of approximately $572 million, significantly less than the market consensus of $650.71 million.  Farfetch also issued an FY 2023

revenue forecast of approximately $2.5 billion, compared to the average analyst estimate of $2.8 billion and the Company's prior FY 2023 revenue forecast of $2.9 billion.

7.     That same day, Farfetch held a conference call with investors and analysts to discuss the Company's Q2 2023 results.  During that call, Company management disclosed that significant slowdowns in growth in the U.S. and China, onboarding challenges affecting the launch of the Reebok partnership, and issues with inventory and shipping had negatively impacted Farfetch's revenue and GMV for the quarter, as well forced the Company to rein in expectations for FY 2023.

8.     Then, on August 18, 2023, media outlets reported that multiple analysts had downgraded Farfetch based on its poor Q2 2023 results and disappointing guidance for FY 2023.

9.     Following these developments, Farfetch's Class A ordinary share price fell $2.15 per share, or 45.17%, to close at $2.61 per share on August 18, 2023.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

13.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Plaintiff is a resident of this Judicial District, and a

substantial part of the property that is the subject of this action is thus situated in this Judicial District.   Moreover, pursuant to Farfetch's most recent annual report on Form 20-F, as of December 31, 2022, nearly 352 million of the Company's Class A ordinary shares were outstanding.   Farfetch's Class A ordinary shares trade on the New York Stock Exchange ("NYSE").   Accordingly, in addition to Plaintiff, there are presumably hundreds, if not thousands, of investors in Farfetch's Class A ordinary shares located within the U.S., some of whom, like Plaintiff, undoubtedly reside in this Judicial District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

15.     Plaintiff, as set forth in the attached Certification, acquired Farfetch securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.   Plaintiff resides in St. Mary's County, Maryland, which is located in this Judicial District.

16.     Defendant Farfetch is organized under the laws of the Cayman Islands with principal executive offices located at The Bower, 211 Old Street, London EC1V 9NR, United Kingdom.   Farfetch's Class A ordinary shares trade in an efficient market on the NYSE under the ticker symbol "FTCH".

17.     Defendant José Neves ("Neves") has served as Farfetch's Chief Executive Officer at all relevant times.   Defendant Neves is also Farfetch's Founder and Chaiman of the Company's Board of Directors.

4

18.     Defendant Elliot Jordan ("Jordan") served as Farfetch's Chief Financial Officer at all relevant times.

19.     Defendant Stephanie Phair ("Phair") has served as Farfetch's Group President at all relevant times.

20.     Defendants Neves, Jordan, and Phair are referred to herein collectively as the "Individual Defendants".

21.     The Individual Defendants possessed the power and authority to control the contents of Farfetch's SEC filings, press releases, and other market communications.   The Individual Defendants were provided with copies of Farfetch's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.   Because of their positions with Farfetch, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.   The Individual Defendants are liable for the false statements and omissions pleaded herein.

22.     Farfetch and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Farfetch, together with its subsidiaries, operates a global platform for the luxury fashion industry.   In addition to revenue, one of Farfetch's most important financial metrics is GMV, which the Company defines as the total dollar value of orders processed, inclusive of

product value, shipping, and duty, and net of returns, value added taxes, and cancellations. According to Farfetch, the Company's GMV correlates closely with its revenue.

24.     Farfetch's largest markets include, *inter alia*, the U.S. and China.  Despite recent softness in those markets, the Company assured investors during the Class Period that, as of Q1 2023, those markets had either recovered or were recovering and were expected to drive future revenue and GMV growth, particularly in Q2 2023.

**Materially False and Misleading Statements Issued During the Class Period**

25.     The Class Period begins on March 9, 2023, the day after Farfetch filed an annual report on Form 20-F with the SEC during after-market hours, reporting the Company's financial and operational results for the quarter and year ended December 31, 2022 (the "2022 20-F").  With respect to Farfetch's U.S. market, the 2022 20-F stated, in relevant part:

> We see a significant opportunity ahead in building awareness of, and engagement with, our brand. During the year ended December 31, 2022 we continued to build on these efforts through brand campaigns mainly focused in the [U.S.]. The focus of these activations was the value of choice we offer to consumers and were launched across various channels, both online and offline, with the intention to build brand awareness, preference, and an emotional connection with our brand. We intend to continue implementing a "full-funnel" approach to marketing in 2023 for the purpose of continuing to build our brand and develop consumer intent, leveraging innovation, content, and social media, as well as our partnerships with luxury brands.

26.     With respect to Farfetch's Chinese market, the 2022 20-F stated, in relevant part:

> Over the next eight years, Chinese consumers are expected to become the largest luxury market and represent more than $240 billion in annual luxury sales by 2030. This represents a significant opportunity, and we have invested in people and technology, centrally and locally, to support our continued growth. With mainland China as the second largest market by GMV for the Farfetch Marketplace for the year ended December 31, 2022, we are one of a limited number of Western e-commerce companies which has demonstrated success in penetrating China. We have achieved this in part by investing in localization, including a localized website and apps, our storefront on Tmall Luxury Pavilion, WeChat stores and WeChat Mini programs, presence in local social media channels, such as Red Book and

Douyin, private client stylists, customer service teams, locally preferred payment methods, and a cross-border customs clearance solution.

Our Farfetch China joint venture, in partnership with Alibaba and Richemont, includes Farfetch Marketplace operations in the China region, as well as our operations on Tmall Luxury Pavilion. This channel is intended to drive awareness of the Farfetch brand in China and expand the reach of our global luxury platform to Alibaba's Tmall Luxury Pavilion consumers, offering our luxury brand partners an opportunity to also elevate their brand awareness with Chinese consumers, while also significantly expanding their addressable market of luxury consumers through their participation on the Farfetch Marketplace.

27.     With respect to Farfetch's purported "optimiz[ation of its] global logistics and operations capabilities", as well as "smart", "scalable, capital efficient and highly agile" supply chain capabilities, the 2022 20-F stated, in relevant part:

We drive interactions between our business pillars to leverage our platform including optimizing our global logistics and operations capabilities, including our Fulfilment by Farfetch initiative, which offers fulfilment solutions for luxury partners.

* * *

We have invested significant resources in developing our fully integrated logistics network. We have developed smart supply chain capabilities which make our supply chain scalable, capital efficient and highly agile, including back-end integrations into multiple supply points and algorithms that are built around deep analytics. These capabilities are developed at a platform level and therefore can also be utilized by our FPS [Farfetch Platform Solutions] clients. In addition, through our Fulfilment by Farfetch proposition we offer logistics solutions tailored to the luxury industry with our third-party logistics warehouses.

28.     Appended as exhibits to the 2022 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants Neves and Jordan certified that "[t]he [2022 20-F] fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act" and "[t]he information contained in the [2022 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

29.     On May 3, 2023, Farfetch issued a press release announcing that the Company had commercially launched its Reebok partnership.  That press release quoted Defendant Neves, who stated, in relevant part:

> Launching the partnership with Reebok is an important execution milestone in FARFETCH's plans for 2023. We are delighted that the NGG++ and FARFETCH Platform Solutions teams **have ensured Reebok's wholesale and e-commerce operations are up and running on time and on budge**t. We look forward to delivering on further milestones for Reebok throughout our partnership.

(Emphasis added.)

30.     On May 18, 2023, Farfetch issued a press release announcing its Q1 2023 financial results (the "Q1 2023 Earnings Release").  The Q1 2023 Earnings Release quoted Defendant Neves, who represented that Farfetch was on track to deliver on its 2023 goals, as demonstrated by its GMV growth in the U.S. and China, as well as the launch of its Reebok partnership, stating, in relevant part:

> I am delighted to report that Farfetch was back to growth in [Q1] 2023. Our [Q1] results represent the first step towards achieving our plan for 2023, our Year of Execution, and demonstrate our strong execution in the face of continued macro headwinds. **Our sequential improvement in GMV growth in the US and China, our two largest markets . . . indicate the strength and resilience of our core business. This, on top of our recent launches of [inter alia] . . . Reebok . . . confirm we remain on track to deliver on our plan for 2023.**

(Emphasis added.)

31.     In addition, the Q1 2023 Earnings Release quoted Defendant Jordan, who likewise represented that Farfetch was delivering on its goals for 2023, despite "unprecedented macro challenges", which the Company had purportedly successfully navigated, stating, in relevant part:

> We have delivered what we set out to achieve, with accelerating underlying growth, disciplined cost control and improved cash flows. We have successfully navigated through unprecedented macro challenges, and through continued focused execution, we remain on track to deliver a year of luxury market-beating growth, a return to profitability and positive free cash flow.

32.     With respect to Farfetch's Reebok partnership, the Q1 2023 Earnings Release stated, in relevant part, that the Company had "*Reebok* e-commerce sites in Europe replatformed by FPS"—the Company's purported comprehensive modular white-label business-to-business e-commerce solution for brands and retailers—and that "[w]holesale operations [are] now engaging with key strategic accounts[.]"

33.     Also on May 18, 2023, Farfetch hosted a conference call with investors and analysts to discuss its Q1 2023 results (the "Q1 2023 Earnings Call").  On the Q1 2023 Earnings Call, Defendant Neves represented that Farfetch had delivered on, or was on schedule to deliver on, its 2023 goals related to, *inter alia*, its Reebok partnership launch, stating, in relevant part:

> We had set 2023 to be our year of execution. And I'm delighted that we are absolutely delivering as reflected in our Q1 results as well as recent milestone launches. Our key 2023 launches, including Reebok . . ., have either been delivered or remain on schedule for launch later this year[.]
>
> * * *
>
> [O]ur new brand platform license, Reebok, went live this month, thanks to FPS' launch of the European e-commerce channel and the brand platforms kickoff of wholesale operations.

34.     Also during the Q1 2023 Earnings Call, Defendant Neves touted Farfetch's growing market in China, as well as China's purported return to normality and appetite for luxury products following COVID-19 lockdowns, stating, in relevant part:

> With respect to China, we saw a marked improvement in Q1 Mainland China GMV. While still in decline, it was to a lesser extent than in Q4 2022. And I'm pleased to share that performance has continued to ramp up as we expected, with GMV back to growth quarter-to-date.
>
> I have just spent a week in Mainland China and Hong Kong, and I am very excited by what I witnessed. Not only does the country seem to be back to normal with a lot of positive energy, it is also clear that the appetite for luxury is very strong. This makes me even more enthusiastic in light of what Farfetch has built in this market.

I believe we are the only western companies succeeding at a multi $100 million scale in online luxury in China. In fact, very few Western Internet companies have been able to find a strong product market Fit in China. Yet Farfetch, thanks to the unique dynamics of the luxury industry, our continued investment in localized operations over the past eight years, and an amazing team on the ground has created a very differentiated platform for luxury brands to reach their Chinese customers digitally.

China is expected to represent more than 25% of the luxury industry by 2030, and with Mainland China at less than 10% of our overall business. This means we have significant potential for further growth as our recovery in this market accretes positively to our overall 2023 plans.

35.     With respect to Farfetch's U.S. market, Defendant Neves stated the following, in

relevant part, on the Q1 2023 Earnings Call:

Turning to the U.S. in Q1, GMV declines as expected, as a result of our reduction of U.S. online marketing investment by more than 20% over the last three quarters in light of the heightened promotional environment, and our increased focused on optimizing for profitability. ***But we're pleased to see that we have actually increased the active customer count and others by high single digits, and at U.S. GMV declined to a lesser extent in Q1 than in Q4 2022.***

We expect the promotional dynamic will moderate over the course of the year as retailers sell through their inventory positions. And as we start to comp 2022 declines in Q3 and Q4, we expect U.S. to be back to growth in the second half of 2023.

(Emphasis added.)

36.     Defendant Jordan likewise discussed purported positive trends in Farfetch's U.S.

market on the Q1 2023 Earnings Call, while simultaneously downplaying the negative impact of

continued softness in that market, stating, in relevant part, that although growth in the Americas

was "partially offset by continued softness in the U.S. as a result of the promotional environment",

the Company had "specifically tailored our demand generation expense in this market to drive

efficiencies."

37.     Defendant Jordan also discussed purported positive trends in Farfetch's China market on the Q1 2023 Earnings Call, while simultaneously downplaying the negative impact of continued softness in that market, stating, in relevant part:

> Asia Pacific improved quarter-on-quarter with an improvement in China, albeit still lower year-on-year. As [Defendant Neves] mentioned, ***this important market is back to growth in Q2 to-date***, in line with the ramp up that we expected for the full year.

(Emphasis added.)

38.     In addition, Defendant Jordan discussed Farfetch's purported "tightening [of its] inventory balances" on the Q1 2023 Earnings Call, while providing FY 2023 revenue guidance of $2.9 billion, stating, in relevant part:

> Compared to Q1 2022, th[e] improvement [in cash and cash equivalents] was a result of a reduction in investment spend, and actions taken to improve our working capital position, including ***tightening our inventory balances***. We expect each quarter of 2023 to be stronger in terms of use of cash than the equivalent of 2022, due to stronger adjusted EBITDA, reducing our first-party inventory balances, reversing the post-Brexit buildup of our VAT receivables, due in from European governments, which currently stands at over $200 million and expanding our marketplace creditor position as we return to growth. This means we expect to close Q4 '23 in line with the closing Q4 2022 position.
>
> That leads nicely to [FY] guidance. And I wanted to remind everyone of the guidance we set for 2023, which remains unchanged . . . . ***We expect revenue of $2.9 billion up circa 25%.*** Stable year-on-year margins including brand platform gross profit margin of 48% to 50% and digital platform order contribution margin of 33% to 35%.

(Emphases added.)

39.     Also on the Q1 2023 Earnings Call, in response to an inquiry from a JP Morgan analyst regarding the sustainability of Farfetch's growth in the U.S., Defendants touted that both the U.S. and Chinese markets had recovered, represented that the Reebok partnership was on budget and schedule, and downplayed any concerns with inventory.  For example, the exchange between Defendant Neves and the JP Morgan analyst read, in relevant part:

**[JP Morgan Analyst]**

. . . . Can you talk more about the sequential improvement you're seeing in the U.S. despite tougher macro environment. And then just more broadly, ***as we are roughly halfway through Q2***, are you seeing growth accelerate nicely on the easier comps and some of the new partnerships. And then if you could just also comment on the sustainability of demand generation leverage that you're seeing. Thank you.

**[Defendant] Neves**

Look, José, here. I'll cover your broader question first and then touch on U.S. And then I'll let Stephanie cover the customer and demand generation part of the question. Look, ***we started 2023 as our year of execution and really happy with delivering against that – was a quarter where we were back to growth and a quarter of acceleration in our top methods both U.S., China*** but also other markets.

And it was a quarter of launches and key launches, landmark launches, ***Reebok is live on budget and on schedule***.

\* \* \*

And just to elaborate a little bit more in terms of U.S. Look in Q3, we shared with you when we noticed that the market was becoming very promotional in the U.S., retailers, luxury retailers, had built inventory levels. And we were starting to see a high promotional activity and therefore, we took the decision to prioritize profitability and reduce our demand generation spend to the tune of circa 20%, since then quarter, every quarter.

And as expected, we saw a decline in Q1, although we saw an sequential acceleration from Q4. And in fact, in terms of customers and others, ***we are growing in the U.S.*** So active customers grew high-single digits, others grew high-single digits. And the decrease in GMV is the result of lower AOVs, as the customers are slightly trading down, and taking advantage of the promotional environment elsewhere, and therefore, have become slightly more price sensitive.

\* \* \*

And now for the second half, ***we do think there's a probability of inventories being more managed by retailers and lower inventories across the industry***, less promotional environment. And one thing we know for sure is that the comps will get much easier for us in Q3 and Q4. And that gives us confidence that ***we're going to go back to growth in the U.S.*** And that will also be supported by our broad exposure to other geographies. ***China is, as expected, recovering.*** We're actually positive year-on-year quarter-to-date in Q2. And also, I think we're demonstrating

that our very global business and the investment we've done in internationalization is paying off.

(Emphases added.)

40.     In response to the same JP Morgan analyst inquiry, Defendant Phair responded, in

relevant part:

I'm glad you asked about the demand generation leverage because we are pleased with that, and it's very much an intentional decision, as [Defendant Neves] mentioned. ***We made the choice to drop our demand generation spend to really lean in on efficiencies and be nimble as to where we invest to drive those efficiencies. So the U.S. is a case in point we dropped by 20%, but we didn't see that commensurate drop in sales.***

And I think, to give you a little bit of background around this. This is really the result of a long-term strategy. It's been 15 years of investment in marketing tech to really be able to hone-in on efficiencies. We continue to find new ways of driving sort of profitability through profit multipliers, looking at sort of audience targeting, looking at drilling down to sort of profitability at the product level. It's also a result of an investment over the years.

I've talked a lot about investment in brand building, which shows up over time, diversification of channels as well. I've talked in the past about app being a channel that whilst it's a more expensive channel to acquire customers, it has very strong long-term value.

(Emphasis added.)

41.     Also on the Q1 2023 Earnings Call, when questioned by a Bank of America Merrill

Lynch analyst regarding Farfetch's guidance for 2023, as well as the positive trends Defendants

observed in the U.S. and China, Defendant Jordan continued to downplay concerns with those

markets:

**[Bank of America Merrill Lynch Analyst]**

I just wanted to come back on the guidance for this year. On the underlying basis, I think Elliot you just mentioned that the guidance for this year was between 8% and 10%. But I think initially, when you guided for these numbers, you had in mind that China would only come back to growth in the second half of the year, and you didn't really have a clear view on where the U.S. would be in 2023.

And then today, you're now saying that China is already back to positive in Q2 to date. And if I understood correctly, you're also saying that the U.S. should be up in the second half of the year. So does that mean that you're thinking that the underlying growth could be faster than the initial guidance? Or is it not -- if not, then what the offsetting factor here?

**[Defendant] Jordan**

* * *

So we don't want to get ahead of ourselves in terms of where numbers may or may not be versus that original plan, I think the plan of underlying eight to 10% is still the right plan, in terms of by geography, ***we are seeing China back to growth, absolutely Q2, that will pick up across the rest of the year***, we obviously are still expecting a moderate ramp back up the Q, sorry, the numbers for this year for China will be lower than 2021.

***So we aren't seeing a full recovery back to 2021 levels in our expectations for China. But we are obviously seeing growth from the rest of the year now as we move forward. On the U.S., obviously, we are seeing a better position from where we were in Q4. And I think that will improve as we trade through Q2***, whether that will get to positive territory in the U.S. is yet to be seen. So I think second half growth for U.S. is probably what you should have in your numbers. And that obviously, will allow us to deliver this 8% to 10% underlying.

(Emphases added.)

42.     Also on the Q1 2023 Earnings Call, in response to a Wells Fargo analyst inquiry

regarding expectations for inventory during the year, Defendant Jordan touted Farfetch's inventory

management capabilities:

**[Wells Fargo Analyst]**

[Defendant Jordan], maybe for you. When we look at the inventory in the balance sheet in the 1P business, can you talk about the quality of inventory you're sitting on now, what your expectations are on the inventory line as we as we get through the year. And then to that point, the 1P penetration and 1P gross margin, I assume that directionally those should be improving as we move through the year. But can you give more context behind that maybe some more specific numbers about what we should be expecting there?

**[Defendant] Jordan**

Hi, Irwin. Yes, great questions. Like we've done a superb job actually, in Q1 sort of churning through excess inventory balances that we've been carrying, between the end of the year and now, on an underlying basis, actually, the inventory levels have come down. It's been sort of offset somewhat by Reebok inventory. That's now come onto the balance sheet about $20 million to $25 million of Reebok inventory was added in the quarter. So underlying, we've seen a reduction in our inventory levels, that is clearing through old-dated stock, we've been able to use the sort of current environment of promotions across the industry to manage that stock through and very much focus on moving through the inventory balance that has caused the shift up in terms of share.

* * *

And also we're seeing in Q2 to-date, the ability to continue to sort of move through inventory at slightly better margins than we were expecting. So everything's holding up quite nicely. But plenty of work to get through. My target for the end of the year is to have overall inventory back below $300 million. So we've got something like $50 million, $60 million of inventory at a net level that includes a net of any additions for Reebok through this year, so much higher than that number in terms of underlying inventory to clear, and we're taking that focus through the next few quarters to get that number below $300 million by the end of the year. That will result in continued gross margins below 30% for the rest of the year. And it will mean that 1P as a mix of GMV will probably stay above 20% for the next few quarters. But our intention as we exit this year is to have inventory levels back under control as we go into 2024. And then, the GMV mix will come back below 20% as we see 3P grow again and 1P will sort of moderate.

So hopefully that paints a good picture of where we are very pleased to be working through it. And I think the other key aspect of this is, as we bring that inventory down from today's balance of 346 million to below 300. Obviously, that turns back to cash. And this is where we're seeing the opportunity to really improve our working capital position across the year by turning inventory balances back into cash, which obviously helps us get back to the 700 million plus number by the end of the year.

43.     The statements referenced in ¶¶ 25-42 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Farfetch was experiencing a significant slowdown in growth in the U.S. and China; (ii) Farfetch also faced onboarding challenges impacting the launch of its Reebok partnership; (iii) Farfetch downplayed challenges it

faced with respect to, and/or overstated its ability to manage, its supply chain and inventory; (iv) all the foregoing was having a significant negative impact on Farfetch's revenue and GMV growth; (v) accordingly, Farfetch was unlikely to meet market expectations for its Q2 2023 financial results or its own FY 2023 revenue guidance; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

44.     On August 17, 2023, during after-market hours, Farfetch issued a press release announcing its Q2 2023 financial results (the "Q2 2023 Earnings Release"). For the quarter, the Q2 2023 Earnings Release reported, among other items, revenue of approximately $572 million, significantly less than the market consensus of $650.71 million, stating, in relevant part:

> Revenue decreased $7.3 million year-over-year from $579.3 million in second quarter 2022 to $572.1 million in second quarter 2023, representing a year-over-year decrease of 1.3%. This decrease was primarily driven by a 42.2% decrease in Brand Platform Revenue to $67.4 million, as well as a 15.1% decrease in In-Store Revenue to $22.7 million.

45.     In addition, the Q2 2023 Earnings Release revealed that, for FY 2023, the Company only expected "[r]evenue of approximately $2.5 billion[.]"

46.     Also on August 17, 2023, during after-market hours, Farfetch held a conference call with investors and analysts to discuss the Company's Q2 2023 results (the "Q2 2023 Earnings Call"). During the Q2 2023 Earnings Call, Company management disclosed that significant slowdowns in growth in the U.S. and China, onboarding challenges affecting the launch of the Reebok partnership, and issues with inventory and shipping had negatively impacted Farfetch's revenue and GMV for the quarter, as well forced the Company to rein in expectations for FY 2023. For example, on the Q2 2023 Earnings Call, Defendant Neves disclosed, in relevant part:

> [A]s in the case of many others in the luxury industry, we have seen a less buoyant luxury customer in the U.S. We have seen similar macro dynamics in Mainland

China. Although, we are seeing improvements with Q2 performance sequentially higher, GMV was also in single-digit decline.

The reality is that the recovery has not been as robust as we had expected when we reported our Q1 results. And as a consequence, we have also reduced demand generation investment in this region. Like in the U.S., we believe this is not Farfetch specific as other luxury brands have similarly indicated China is not growing as quickly as previously expected after its reopening in December.

Whilst brands are reporting strong in-store growth against comps during the previous years, strict lockdowns, online sales have not recovered as quickly as expected by many in the luxury industry. The slower recovery in these two large markets. . . leads us to moderate our second half 2023 growth expectations for the marketplace.

47.     Similarly, on the Q2 2023 Earnings Call, Defendant Phair disclosed, in relevant

part:

In Q2, Brand platform GMV decreased 41% to $63 million. This decline was driven by a phasing of deliveries from Q2 as wholesale accounts, predominantly department stores and retailers in the U.S. and UK, reduced intake deliveries due to heightened inventory positions, resulting from the challenging macro environment. The phasing of shipments was also due to some onboarding challenges with the launch of Reebok, which have resulted in a slower ramp-up.

\* \* \*

For the remainder of the year, we expect wholesale to remain under pressure as we have seen retailers adjusting their open to buy for the spring/summer '24 season. This is reflected in our revised 2023 expectations for the brand platform, which Elliot will cover.

\* \* \*

Moving to Reebok . . . . [T]here have been some initial challenges in transitioning the business from Adidas[.]

\* \* \*

We expect the initial transitional challenges to result in Reebok now delivering approximately $200 million across both the brand and digital platforms in 2023[.]

48.     In addition, on the Q2 2023 Earnings Call, Defendant Jordon disclosed, in relevant

part:

Brand platform GMV declined 41% due to delayed wholesale shipments as retailers phase back deliveries of fall winter '23, whilst they clear through their spring/summer '23 inventory holdings. This decline in GMV had an impact on revenue which declined 1% year-on-year and gross profit, which declined 9%.

* * *

The digital platform grew slower than expected, driven by the U.S. and China on the marketplace and as GMV from Reebok ramped up less quickly than anticipated.

* * *

Digital platform order contribution margin was 31.2%, down 50 basis points principally due to a reduction in first-party gross margin due to action we are taking to reduce inventory levels, plus the increased mix of first-party revenue at lower gross margin[.]

* * *

Looking ahead, we are adjusting our near-term expectations across H2 to reflect an updated assessment of the luxury market in the U.S. and China. This means moderating our GMV growth expectations.

* * *

On the brand platform, we are now guiding to GMV of approximately $450 million, broadly flat year-on-year. This estimate reflects ongoing macro headwinds affecting wholesale orders of existing brands offset by incremental GMV from the launch of Reebok this year . . . . The guide of GMV also reflects the expected catch-up in delayed brand platform shipments from Q2.

49.    Then, on August 18, 2023, during pre-market hours, media outlets reported that multiple analysts had downgraded Farfetch's shares based on the Company's poor Q2 2023 results and disappointing guidance for FY 2023.  For example, an article published by investor news website *SeekingAlpha*, entitled "Farfetch slides 39% as analyst downgrades pour in", reported, in relevant part:

	JPMorgan downgraded Farfetch (NYSE:FTCH) to a Neutral rating from Overweight on Friday after taking in the retailer's Q2 earnings report, which included a miss on the revenue line, sluggish GMV growth, and guidance below expectations.

Analyst Doug Anmuth . . . noted that the "Year of Execution" is proving quite challenging given U.S. and China weakness, early Reebok partnership hiccups, and wholesale pressures.

"Weakening trends through the back half of 2Q make it clear that FTCH has limited near-term visibility, & execution risk increases on a much bigger business once the YNAP-Richemont deal closes."

JPMorgan slashed its price target on FTCH to $6.00 from $15.00.

Elsewhere on Wall Street, KeyBanc Capital Markets downgraded Farfetch (FTCH) to Sector Weight from Overweight on what it sees as a less clear path to profitability.

During the Farfetch's (FTCH) earnings call (transcript), executives pointed to a less buoyant luxury customer in the U.S. and similar macro dynamics in Mainland China. "The reality is that the recovery has not been as robust as we had expected when we reported our Q1 results," lamented CEO [Defendant] Neves.

Shares of Farfetch (FTCH) fell 38.66% in premarket action on Friday to $2.92 and are on a path to open at their lowest trading level ever.

50.     Following these developments, Farfetch's Class A ordinary share price fell $2.15 per share, or 45.17%, to close at $2.61 per share on August 18, 2023.

51.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

52.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

53.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Farfetch securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

54.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Farfetch securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Farfetch or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

55.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

56.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

57.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Farfetch;

- whether the Individual Defendants caused Farfetch to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Farfetch securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

58.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

59.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Farfetch securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Farfetch securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

60.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

61.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

62.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

64.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Farfetch securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Farfetch securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

65.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Farfetch securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Farfetch's finances and business prospects.

66.     By virtue of their positions at Farfetch, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

67.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Farfetch, the Individual Defendants had knowledge of the details of Farfetch's internal affairs.

68.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Farfetch.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Farfetch's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Farfetch securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Farfetch's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Farfetch securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

69.    During the Class Period, Farfetch securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Farfetch securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired

said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Farfetch securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Farfetch securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

70.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

72.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

73.     During the Class Period, the Individual Defendants participated in the operation and management of Farfetch, and conducted and participated, directly and indirectly, in the conduct of Farfetch's business affairs.  Because of their senior positions, they knew the adverse non-public information about Farfetch's misstatement of income and expenses and false financial statements.

74.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Farfetch's financial condition and results of operations, and to correct promptly any public statements issued by Farfetch which had become materially false or misleading.

75.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Farfetch disseminated in the marketplace during the Class Period concerning Farfetch's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Farfetch to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Farfetch within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Farfetch securities.

76.     Each of the Individual Defendants, therefore, acted as a controlling person of Farfetch.  By reason of their senior management positions and/or being directors of Farfetch, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Farfetch to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Farfetch and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

77.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Farfetch.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  October 20, 2023                          Respectfully submitted,

/s/ Daniel S. Sommers
Daniel S. Sommers (Md. Bar No. 15822)
S. Douglas Bunch
(*pro hac vice* application forthcoming)
**COHEN MILSTEIN SELLERS &**
  **TOLL PLLC**
1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: dsommers@cohenmilstein.com
          dbunch@cohenmilstein.com

*Liaison Counsel for Plaintiff*

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com

ahood@pomlaw.com

***Attorneys for Plaintiff***

# CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I,  Michael Ragan                                    , make this declaration

pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private

Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against FarFetch Limited ("FarFetch") and authorize

the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire FarFetch securities at the direction of plaintiffs'

counsel or in order to participate in any private action arising under the Securities Act or Exchange

Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who

purchased or otherwise acquired FarFetch securities during the Class Period as specified in the

Complaint, including providing testimony at deposition and trial, if necessary.  I understand that

the Court has the authority to select the most adequate lead plaintiff in this action.

5.    The attached sheet lists all of my transactions in FarFetch securities during the Class

Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is

signed, I have not served or sought to serve as a representative party on behalf of a class under the

federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of

the Class as set forth in the Complaint, beyond my pro rata share of any recovery, except such

reasonable costs and expenses directly relating to the representation of the class as ordered or

approved by the Court.

8.      I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.


**Executed** 10/16/2023
        **(Date)**

—DocuSigned by:

*Michael Ragan*

**(Signature)**
C867061E27E374E0...


Michael Ragan
        **(Type or Print Name)**

**Farfetch Limited (FTCH)**                                                                 **Michael Ragan**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 8/8/2023 | 1 | $5.0985 |
| Purchase | 8/8/2023 | 149 | $5.0985 |
| Purchase | 8/8/2023 | 0.95490196 | $5.1000 |
| Purchase | 8/10/2023 | 390 | $5.1895 |
| Purchase | 8/10/2023 | 0.40269749 | $5.1900 |
| Purchase | 8/11/2023 | 240 | $5.0985 |
| Purchase | 8/11/2023 | 0.64117647 | $5.1000 |
| Purchase | 8/15/2023 | 813 | $4.9185 |
| Purchase | 8/15/2023 | 0.25609756 | $4.9200 |