UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| IN RE FARFETCH LIMITED SECURITIES LITIGATION | **OPINION & ORDER**<br>23-cv-10982 (ER) |
|---|---|

RAMOS, D.J.:

Co-Lead Plaintiffs Fernando Sulichin and Yuanzhe Fu (collectively, "Plaintiffs") bring this putative class action against Farfetch Limited ("Farfetch" or the "Company") and its direct subsidiary FF Realisations plc (f/k/a Farfetch Holdings plc) ("FF Holdings"), and individuals José Manuel Ferreira Neves ("Neves"), Elliot Gilbert Jordan ("Jordan"), and Stephanie Nadine Phair Kooij ("Phair") (collectively, "Defendants"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5. Specifically, the Second Amended Class Action Complaint ("SAC")[1] alleges that Defendants made materially false or misleading statements, omitted material facts, and carried out a scheme to deceive investors in order to artificially inflate Farfetch stock prices in violation of Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5, and that Neves, Jordan, and Phair (collectively, "Individual Defendants") were controlling persons of Farfetch[2] and FF Holdings, violated Section 20(a) of the Securities Exchange Act, and are culpable participants in the alleged fraud. Before the Court is the Individual Defendants' motion to dismiss the SAC. Docs. 79 and 82. For the reasons set forth below, the motion is GRANTED.

[1] Unless otherwise noted, citations to "¶_" refer to the Second Amended Class Action Complaint, Doc. 78.

[2] By an Order of the United States Bankruptcy Court for the District of Delaware dated August 5, 2024, all pending actions against Farfetch are stayed.

# I. BACKGROUND

## A. Factual Background

The background is drawn from factual allegations in the SAC, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), documents attached to the complaint as exhibits, and documents incorporated by reference therein, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). The Court accepts all well-pleaded factual allegations as true. *Id.* The Court assumes familiarity with the facts presented in the previous opinions and orders in this case. *See* Docs. 73 (granting the Individual Defendants' first motion to dismiss), 85 (denying Plaintiffs' motion to modify the Private Securities Litigation Reform Act ("PSLRA") automatic discovery stay). For present purposes, the Court provides an abbreviated summary of the relevant facts herein.

This is a federal securities class action lawsuit brought on behalf of shareholders who purchased Farfetch securities between December 1, 2022 and December 17, 2023 (the "Class Period"). ¶ 1. Plaintiffs allege that Defendants made materially false or misleading statements, omitted material facts, and deceived investors in order to artificially inflate Farfetch stock prices in violation of Section 10(b) and Rule 10b-5, ¶¶ 216–17, and that Neves, Jordan, and Phair, as controlling persons of Farfetch and FF Holdings, violated Section 20(a), ¶ 226.

Farfetch was founded in 2007 as a technology company, supporting third-party sales of luxury goods to consumers worldwide via its digital marketplace platform. ¶ 2. Farfetch operated as a private company for over ten years before launching its initial public offering ("IPO") in September 2018, with shares listed on the New York Stock Exchange ("NYSE"). *Id.* Prior to the IPO, on May 15, 2018, "Farfetch Limited was incorporated under the laws of the Cayman Islands to become the holding company of Farfetch.com Limited and its subsidiaries." ¶ 210. Plaintiffs allege that Farfetch promoted itself to investors based on its "low risk, high margin" third-party marketplace platform design. ¶ 2, 36. Plaintiffs contend that as a result, Farfetch achieved a

successful IPO that raised $1 billion and led to an $8 billion valuation. ¶ 2. Plaintiffs assert that, "seemingly overnight," the Company abandoned this business model, shifting instead to a "growth-by-acquisition" strategy focusing on "acquisitions of first-party retailers and wholesale distributors" totaling $1.6 billion. *Id.* Specifically, Farfetch purchased Stadium Goods, a first-party retailer, for $250 million on December 12, 2018, Toplife, a luxury e-commerce platform, for $50 million on February 28, 2019, and New Guards Group ("NGG"), a luxury fashion conglomerate, for $675 million on August 8, 2019. ¶ 39. Following these acquisitions, Farfetch reorganized its corporate structure into three groups: (1) the digital platform, handling third- and first-party transactions, (2) the brand platform, handling production and distribution of the brands owned and licensed by NGG, and (3) in-store, handling brick-and-mortar stores. ¶ 40.

To finance this strategy, Farfetch took on substantial debt, including $1.25 billion in 2020. ¶ 3. Specifically, in February 2020, Farfetch issued and sold $250 million in convertible senior notes, in April 2020, $400 million in convertible senior notes, and in November 2020, $600 million in convertible senior notes. ¶¶ 46–48.

Plaintiffs allege that, beginning in 2020, the COVID-19 pandemic and the spike in online shopping "provided a façade of profitability" while masking the true extent of the negative impact of these acquisitions. ¶ 5. Plaintiffs argue that these acquisitions led to inefficiencies, including overlapping business units, unsustainable operating expenses relating to excess inventory and large upfront Value Added Tax ("VAT") obligations, and heavy discounts leading to low profit margins. *Id.* Plaintiffs allege that Farfetch was nearing a liquidity crisis and potential bankruptcy, sustained only by debt financing, which was rapidly depleting. *Id.*

Farfetch failed to meet its expectations for the third quarter of 2021 ("Q3 2021") and lowered its projections for Q4 2021. ¶ 53. Farfetch faced further challenges when it ceased operations in Russia, which accounted for 20% of its sales, following Russia's invasion of Ukraine, ¶ 55, and upon the death of Virgil Abloh, the founder and creative

director of Off-White, a fashion brand which contributed an estimated 75-80% of NGG's sales, ¶ 58. These events led to weak performance in both Q1 and Q2 2022, leading Farfetch to lower its guidance for the 2022 fiscal year ("FY 2022"). ¶¶ 56, 59–60.

Nonetheless, Farfetch continued making additional acquisitions and strategic investments in 2022. ¶ 3. In the first half of 2022, Farfetch acquired beauty retailer Violet Grey for approximately $56 million in total assets, ¶ 63, NGG partnered with Adidas to bring to market luxury collaborations with Reebok, committing to minimum royalty payments of approximately $374 million over 11 years, ¶ 65, and Farfetch invested $200 million in Neiman Marcus Group, ¶ 67. During the Q2 2022 investor call, Neves stated that the Company was looking to reduce headcount and marketing expenses to cut costs driven by inefficiency. ¶ 76. Farfetch's primary operating subsidiary entered into a $400 million credit agreement in October 2022, which was expanded by an additional $200 million in August 2023. ¶ 3. Plaintiffs claim that leading up to and through the Class Period, Farfetch gave the impression that it was financially secure, ¶ 4, and that its financials supported future growth aimed at returning to profitability and positive free cash flow, ¶ 6.

Plaintiffs allege, however, that in December 2022, Farfetch secretly initiated "Project Athena," an effort to pursue a take-private or similar transaction, which they did not disclose to investors. ¶ 6. Plaintiffs allege that this plan devolved into an effort "to secure a near-identical future for the Farfetch Business free of the financial obligations and liabilities held by the public entity, Farfetch." ¶ 90. Despite its efforts, Farfetch was not able to secure the necessary capital by the fall of 2023. ¶ 94. In response, the Company planned to dispose of Farfetch stock and secure a future for the business. *Id.* Plaintiffs allege that Farfetch formed a special committee and pursued a sale of its assets in a single transaction, resulting in the write-off of $1 billion in debt. ¶ 6.

Plaintiffs allege that until August 2023, while Farfetch engaged in Project Athena, Defendants made numerous representations to the market suggesting the company

maintained a strong financial posture. ¶ 6–7. Plaintiffs allege that Defendants took steps to conceal the Company's growing liquidity crisis to ensure continued access to financing and prop up the stock price of Farfetch long enough to secure a future for the Farfetch business. ¶ 96. For example, during the Company's Capital Markets Day on December 1, 2022, Neves represented that Farfetch was going "to continue on a path of growth, profitable growth and cash flow generation." ¶ 97. On the same day, Jordan stated: "[W]e have clear visibility that we will deliver not only growth, but sustained profitability and positive free cash flow moving forward." ¶ 101. At the beginning of Capital Markets Day, the introductory speaker stated:

> We will also be making forward-looking statements today. Actual results could differ materially from those forward[-looking] statements, and we undertake no obligation to publicly update or revise them. For a discussion of some of the factors that could cause actual results to differ from these forward-looking statements, please refer to our SEC filings. We will also refer to certain non-IFRS financial measures. You can find reconciliations of these measures to the most directly comparable IFRS financial measures in the slide presentations, which will be available at farfetchinvestors.com.

Doc. 81-8 at 5. Plaintiffs allege that the Individual Defendants' representations during Capital Markets Day created the false impression that Farfetch was committed to achieving profitability and free cash flow through organic growth of existing investments, and that it could achieve this growth through its balance sheet and credit lines. ¶ 103. Plaintiffs further allege that throughout 2023, Defendants falsely assured investors of the Company's near-term and long-term liquidity strength, reinforced by Farfetch's commitment to cost control and returning to profitability and free cash flow, including on February 23, 2023, during an investor call discussing Q4 2022. ¶ 104. At the beginning of this call, a representative of Farfetch stated, "[b]efore we begin, we would like to remind you that our discussions today will include forward-looking statements. Actual results could differ materially from those indicated in the forward-looking statements, and forward-looking statements made today speak only to our expectations as of today."

Doc. 81-10 at 5. Phair told investors that the Company was in a "strong position" to deliver on its goals for 2023, and Neves stated that Farfetch was "an even stronger and more efficient organization," and that he was "more confident than ever" about the Company's "prospects to deliver growth, profitability and positive free cash flow in 2023 and beyond." ¶¶ 104–05, 158. Phair also stated: "The work we've done throughout 2022 and the years prior, investing in our customer and in our partnerships with brands and boutiques puts us in a strong position to deliver on our 2023 goals." ¶ 105. Neves also stated that Farfetch had "all the key elements to execute on [its] plan." ¶ 157.

On March 8, 2023, Farfetch filed its Form 20-F for FY 2022. Doc. 81-12. The document advised, "[t]his Annual Report contains statements that constitute 'forward-looking statements' within the meaning of the [PSLRA]. We intend such forward-looking statements to be covered by the safe harbor provisions . . . . These statements are neither promises nor guarantees, but involve known and unknown risks . . . that may cause our actual results, performance or achievements to be materially different . . . ." *Id.* at 11. The Form 20-F also stated: "We believe that our sources of liquidity and capital will be sufficient to meet our business needs for at least the next twelve months. We also expect these sources of liquidity will be sufficient to fund our long-term contractual obligations and capital needs." ¶ 106.

However, in April 2023, Plaintiffs contend that senior management was concerned that Farfetch could be forced to delist from the NYSE or even cease to exist by the end of the year. ¶ 108. A former employee ("FE5"), who met with Jordan in April 2023, recalled that Jordan stated that major investors may pull their funding because of longstanding internal deficiencies. *Id.* On May 18, 2023, in the Q1 2023 Earnings Release, Jordan stated that the Company, "delivered what [it] set out to achieve . . . . [It has] successfully navigated through unprecedented macro challenges, and through continued focused execution, [it] remain[s] on track to deliver a year of luxury market-beating growth, a return to profitability and positive free cash flow." ¶ 107. This Release

was accompanied by a warning that it "contains forward-looking statements within the meaning of the [PSLRA]. . . . These statements are neither promises nor guarantees, but involve known and unknown risks, uncertainties and other important factors that may cause actual results, performance or achievements to be materially different . . . ." Doc. 81-16 at 18. On September 11, 2023, Farfetch US Holdings, Inc., a subsidiary of FF Holdings, borrowed an additional $200 million dollars from JP Morgan as a term loan. ¶ 109. Plaintiffs allege that the statements the Individual Defendants made about the financial well-being of Farfetch during this period were materially false and misleading because, as Defendants knew, the Company was facing severe financial hardship and Defendants were "actively participating in efforts to secure alternative financing . . . due to its poor financial condition and growing liquidity pressures." ¶¶ 154, 165, 168, 174, 178, 181.

Plaintiffs contend that Farfetch's stock price "came tumbling down" after a series of revelations indicating that Farfetch was not executing on its plan to achieve profitability and positive free cash flow, that its previous guidance about performance was not to be trusted, and ultimately that the business had been gutted and sold off for its parts to avoid insolvency. ¶ 7. After the release of poor Q2 2023 results and significantly reduced FY 2023 guidance, the stock price fell 45.17% to $2.61 on August 18, 2023. ¶¶ 111, 114. On November 28, 2023, Farfetch announced that it would not disclose Q3 2023 results and that its previous guidance and forecasts could not be relied upon. ¶ 115. The following day, the stock price dropped 53.8% to $0.97. ¶ 116. On December 18, 2023, Farfetch officially agreed to transfer all of the business and assets of FF Holdings, the primary subsidiary of Farfetch, to Coupang, Inc. for a $500 million bridge loan. ¶ 117. According to Plaintiffs, this effectively gutted the publicly traded company of its assets, leaving it unable to meet its debt obligations and stripping investors of any value the shares held. *Id.* This culminated in the stock price falling 93.75% to $0.04 a share. ¶ 122. The NYSE commenced delisting proceedings on December 20, 2023. *Id.* On

January 30, 2024, Surpique Acquisition Limited ("Surpique") purchased the Farfetch business. ¶ 127. Plaintiffs allege that this effectively allowed Farfetch to write off over $1 billion of debt obligations. ¶ 131. Shortly after, on February 2, 2024, Wilmington Trust, a creditor of Farfetch Limited, filed a petition for the winding-up of the company in the Grand Court of the Cayman Islands. *See* Doc. 61-1.

Throughout this period, each of the Individual Defendants held a significant amount of stock in Farfetch. On March 4, 2022, Neves owned 47,496,937 shares, Jordan owned 930,183 shares, and Phair owned 767,301 shares. Doc. 81-3 at 117. On December 31, 2023, Neves owned 49,876,223 shares. Doc. 81-22 at 6. On August 30, 2023, Jordan owned 1,604,185 shares. Docs. 81-12 at 121, 81-20 at 3. On August 4, 2023, Phair owned 1,217,283 shares. Docs. 81-12 at 121, 81-19 at 3. However, Jordan and Phair sold shares in August 2023, selling approximately $400,000 and $35,000 worth of stock, respectively, Docs. 81-20 at 3, 81-19 at 3, and Neves moved some of his shares to a holding company between the beginning of 2022 and end of 2023, Docs. 81-3 at 117, 81-12 at 121, 81-22 at 6.

**B. Procedural Background**

Jasmine Wu, individually and on behalf of all others similarly situated, filed the first complaint in this consolidated class action on December 19, 2023 (the "Wu SDNY Action"). Doc. 1. Three members of the putative class filed motions seeking appointment as lead plaintiff.[3] On October 20, 2023, two months prior to the filing of the above-captioned action, a related securities class action asserting substantially the same

[3] The following individuals moved to be appointed as lead plaintiff in this action. On December 19, 2023, movant Michael Bievetski moved to be appointed as lead plaintiff and The Rosen Law Firm, P.A. as lead counsel. Doc. 5. Also on December 19, 2023, movant Eduardo Archer Veloso Martins and Renoporto Investimentos Imobiliários, LDA ("Martins") moved to be appointed as lead plaintiff and Pomerantz LLP as lead counsel for the Class. Doc. 8. Lastly, on January 2, 2024, Fernando Sulichin, individually and on behalf of Lyxor Overseas Holdings Limited and Cinergy Advisors Limited ("Sulichin"), moved to be appointed as lead plaintiff and Levi & Korsinsky, LLP as lead counsel. Doc. 17. Martins and Sulichin, along with three other individuals—Yuanzhe Fu, Tamim Altamimi, and Kaundria West—moved separately to be appointed as lead plaintiff in *Ragan v. Farfetch Limited et al.*, No. 8:23-cv-02857 (D. Md.). Doc. 23 at 2.

claims was filed in the United States District Court for the District of Maryland, *Ragan v. Farfetch Limited et al.*, No. 8:23-cv-02857 (D. Md.). Doc. 23 at 2. On January 22, 2024, the court in *Ragan* entered a stipulation and order transferring the case to the Southern District of New York, which was assigned the case number 24-cv-00532 (the "Ragan SDNY Action," and together with the Wu SDNY Action, the "Related Actions"). *Id.* at 3. On February 6, 2024, the Ragan SDNY Action was transferred from Judge Paul Engelmayer to the undersigned. The same day, upon stipulation and agreement by the parties hereto, the Court consolidated the Related Actions under case number 23-cv-10982, Fernando Sulichin and Yuanzhe Fu were appointed lead plaintiffs, and Levi & Korsinsky, LLP and Hagens Berman Sobol Shapiro LLP were appointed co-lead counsel. *Id.* at 4–5. In that Order, the Court directed Plaintiffs to file an amended complaint in the consolidated case or designate the existing complaint as the operative complaint. *Id.* at 5. The Court also directed Defendants and lead plaintiffs to meet and confer regarding scheduling. *Id.*

On June 21, 2024, lead plaintiffs filed the Consolidated Amended Complaint ("CAC"), alleging two counts: (1) violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R § 240.10b-5); and (2) a violation of Section 20(a) of the Securities Exchange Act by the Individual Defendants. Doc. 34. The CAC alleged a class period between February 24, 2022 through December 17, 2023, inclusive.[4] *Id.* ¶ 1.

On September 11, 2024, the Individual Defendants filed a motion to dismiss the CAC in its entirety, with prejudice. Docs. 43, 46. The Individual Defendants argued that the CAC pleaded no viable theory of securities fraud and should therefore be dismissed. Doc. 44 at 10. Specifically, the Individual Defendants argued that Plaintiffs did not plead any actionable misstatement or omission and, instead, the CAC "sen[t] readers on a

---

[4] The SAC amended the Class Period to be December 1, 2022 through December 17, 2023, inclusive. ¶ 1.

scavenger hunt through large block quotations excerpted from more than 80 different disclosures over a nearly two-year period," in what constituted puzzle-pleading. *Id.* at 11. The Individual Defendants added that nearly all the challenged statements are (1) non-actionable expressions of corporate optimism, (2) forward-looking statements protected by the PSLRA safe harbor, and/or (3) opinion statements. *Id.* Lastly, the Individual Defendants argued that the Plaintiffs did not—and could not—plead facts to meet the requisite "strong" inference that Defendants acted with scienter. *Id.* at 12.

While the Individual Defendants' first motion to dismiss remained pending, on May 1, 2025, Plaintiffs filed a motion seeking to modify the automatic discovery stay imposed by the PSLRA. Doc. 59. Plaintiffs requested production of all "non-privileged documents already produced (or being produced by) Surpique L.P. to Farfetch's liquidator" in response to a Bankruptcy Rule 2004 subpoena in the Cayman proceeding. Doc. 60 at 5. Plaintiffs contended that lifting the stay "impose[d] no undue burden" on Surpique and was "necessary to prevent real and irreparable harm." *Id.* at 7.

On May 22, 2025, non-party Surpique filed a brief in opposition to Plaintiffs' motion to lift the automatic discovery stay. Doc. 67. Surpique argued that Plaintiffs have not satisfied their heavy burden to justify lifting the stay, which Congress has mandated through the PSLRA. *Id.* at 5. Specifically, Surpique argued that Plaintiffs were wrong on the facts, failed to explain why lifting the stay was necessary to avoid causing them undue prejudice, and failed to meet the PSLRA's particularity requirements. *Id.* The Individual Defendants also filed a brief in opposition to Plaintiffs' motion to lift the automatic discovery stay on May 22, 2025, on the same grounds as Surpique. Doc. 68. On February 26, 2026, the Court denied Plaintiffs' motion to lift the automatic discovery stay. Doc. 85.

On September 30, 2025, the Court granted the Individual Defendants' motion to dismiss the CAC. Doc. 73. The Court held that the CAC "fail[ed] to meet the pleading standards of Rule 9(b) and the PSLRA." *Id.* at 27. Specifically, the Court concluded that

Plaintiffs had "failed to allege a material misrepresentation or omission to support a claim under Section 10(b)." *Id.* at 32. The Court further found that Plaintiffs "have not sufficiently alleged an inference of scienter 'at least as strong as the opposing inference,'" and therefore dismissed Plaintiffs' Section 10(b) and Rule 10b-5 claims against the Individual Defendants. *Id.* at 42–43. Because Plaintiffs failed to plead a primary violation of the Securities Exchange Act, the Court also dismissed Plaintiffs' claims pursuant to Section 20(a). *Id.* at 45. The Court granted Plaintiffs leave to file a second amended complaint. *Id.* at 46.

On November 3, 2025, Plaintiffs filed the SAC, alleging two counts: (1) violation of Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5); and (2) violation of Section 20(a) of the Securities Exchange Act by the Individual Defendants. Doc. 78. The SAC alleges a Class Period between December 1, 2022 through December 17, 2023, inclusive. ¶ 1.

On December 18, 2025, the Individual Defendants filed a motion to dismiss the SAC in its entirety. Doc. 79. The Individual Defendants contend that the SAC should be dismissed "for the same reasons this Court dismissed the prior complaint." Doc. 80 at 9.

## II. LEGAL STANDARDS

### A. Rule 12(b)(6)

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

The question in a Rule 12(b)(6) motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of the plaintiff's claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)). Furthermore, "only a complaint that states a plausible claim for relief survives a motion to dismiss" and "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

**B. Rule 9(b)**

Because claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder sound in fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy that requirement, the complaint must: "(1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Communications, Inc. v. Shaar Fund, Limited*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak*, 216 F.3d at 306). The PSLRA imposes similar requirements on claims brought under the Exchange Act: "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission. *Id.* § 78u-4(b)(2)(A). A complaint will survive under that heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights*, *Limited*, 551 U.S. 308, 324 (2007).

**C. External Documents**

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Communications*, 493 F.3d at 98. Courts may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Limited*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted). The Court may also "take judicial notice of public disclosure documents that must be filed with the [SEC] and documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law.'" *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014) (quoting *Kramer v. Time*

*Warner*, *Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991)), *aff'd sub nom. Lucas v. Icahn*, 616 F. App'x 448 (2d Cir. 2015); *see also In re Bank of America AIG Disclosure Securities Litigation*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x. 93 (2d Cir. 2014). However, the Court can consider a company's public filings with the SEC "'only to determine what the documents stated,' and 'not to prove the truth of their contents.'" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis omitted) (quoting *Kramer*, 937 F.2d at 774).

## III. DISCUSSION

### A. Judicial Notice of External Documents

The Individual Defendants attach 25 documents to the Declaration of Jason C. Hegt in support of their motion to dismiss. *See* Doc. 81.

The SAC neither cites nor refers to six of the attached documents:

- Exhibit 9 - Yahoo! Finance Stock Price Record
- Exhibit 19 - Form 144 (S. Phair)
- Exhibit 20 - Form 144 (E. Jordan)
- Exhibit 22 - Form 13G (J. Neves)
- Exhibit 23 - Forbes Article
- Exhibit 24 - Vanguard Think Tank Article

A district court is entitled to consider "the full text of those documents" partially quoted in a complaint but considered integral to ruling on a motion to dismiss. *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 809 (2d Cir. 1996). For a document to be integral, the complaint must do more than merely mention it. *Goel*, 820 F.3d at 559–60. The complaint must "rel[y] heavily upon its terms and effect." *DiFolco*, 622 F.3d at 111 (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)). Here, securities filings partially quoted in the SAC, as well as quarterly earnings calls and releases, are integral to the allegations based on securities fraud. Accordingly, the SAC incorporates these documents by reference, and the Court will consider them in deciding the present motion.

Regarding the documents not cited in the SAC—Yahoo! Finance Stock Price Record, Forms 144 (S. Phair and E. Jordan), Form 13G (J. Neves), the Forbes Article, and the Vanguard Article—the Court may "take judicial notice of public disclosure documents that must be filed with the [SEC]" as well as "documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law,'" *Silsby*, 17 F. Supp. 3d at 354 (quoting *Kramer*, 937 F.2d at 773–74), and of "press coverage establishing what information existed in the public domain during periods relevant to the plaintiffs' claims," *In re Bank of America*, 980 F. Supp. 2d at 570 (citing *Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 425–26 (2d Cir. 2008)). Therefore, this Court may take judicial notice of all of the documents attached to the Individual Defendants' motion to dismiss.

**B. Section 10(b) and Rule 10b-5 Liability**

1. *Plaintiffs Fail to Plead Material Misrepresentations or Omissions*

Plaintiffs make clear that the "undisclosed pursuit" of Project Athena is the driving force behind their theory that the Individual Defendants' statements were misleading. Doc. 83 at 13. Specifically, Plaintiffs argue that the Individual Defendants "publicly assured investors that Farfetch was self-funding and did not need external capital, while secretly pursuing [Project Athena] whose entire purpose was to raise external capital or sell the business due to the company's dire condition." *Id.* at 15. Plaintiffs argue that these two simultaneous events, statements that Farfetch did not "need outside capital," while "actively seeking outside capital" make the statements fraudulently misleading. *Id.* The Individual Defendants counter that nowhere in the SAC do any of the Individual Defendants claim that "Farfetch was self-funding and did not need external capital," but rather, that this was Plaintiffs' "own subjective 'interpretation'" and that the Company was clear that it may pursue additional financing. Doc. 84 at 7. They further argue that Plaintiffs improperly attempt to develop fraud by hindsight because,"[a]t bottom, the SAC alleges that because Farfetch ultimately was

placed into liquidation in early 2024, Defendants must have known that their financial projections going back to December 2022 were false." *Id.* at 6.

At the outset, "it is well-settled that 'fraud by hindsight' is not a cognizable theory of relief." *In re PetroChina Co. Limited Securities Litigation*, 120 F. Supp. 3d 340, 366 (S.D.N.Y. 2015) (quoting *In re Longtop Financial Technologies Limited Securities Litigation*, 910 F. Supp. 2d 561, 579 (S.D.N.Y. 2012)). Plaintiffs state that they do not rely on fraud by hindsight; rather, they argue that the present existence of Project Athena made the statements false or misleading when the Individual Defendants made them. Doc. 83 at 14–15.

Plaintiffs contend that this initiative was inconsistent with the Individual Defendants' statements that "Farfetch was financially secure, self-funding, and not in need of external capital," because Project Athena's "sole purpose was to raise capital through extraordinary transactions." *Id.* at 22–23. However, they fail to show why the existence of a plan to engage in a take-private transaction means that the alleged statements were in fact false or misleading. Plaintiffs, citing *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251–252 (2d Cir. 2014), argue that pursuit of Project Athena is actionable because it "contradicts [Farfetch's] public narrative," making it an actionable omission, Doc. 83 at 23. The problem with this argument is that the SAC does not sufficiently allege that the Individual Defendants said that Farfetch was self-funding and not in need of outside capital.[5] The statements Plaintiffs cite do not make those assurances and are either non-actionable forward-looking statements, non-actionable opinion statements, or non-actionable puffery. ¶¶ 144–86. "Importantly, the new

---

[5] In fact, in Farfetch's 2022 Form 20-F, they explicitly stated: "If we are unable to generate sufficient cash flows from operations in the future, we may have to obtain additional financing." Doc. 81-12 at 103. In the Q2 2023 Earnings Release, they stated: "[A]ny projections of future cash needs and cash flows are subject to inherent uncertainty. In the ordinary course, we continually evaluate opportunities to raise additional equity or debt, obtain credit facilities, enter into leasing arrangements, enter into financing obligations, repurchase common stock, or repurchase, refinance or otherwise restructure debt for strategic reasons or to further strengthen our financial position." Doc. 81-18 at 11.

allegations do not change what the defendants actually said . . . ." *In re Adobe Inc. Securities Litigation*, No. 23 Civ. 9260 (JGK), 2025 WL 3124312, at *12 (S.D.N.Y. Nov. 7, 2025). Instead, Plaintiffs rely on the theory that Project Athena, "a formal process to raise capital or sell the business," imputes liability onto the Individual Defendants, reasoning that the public statements about the financial well-being of Farfetch were materially misleading because they failed to disclose the existence of Project Athena. Doc. 83 at 8. But, the pursuit of a take-private transaction does not necessarily mean a company is facing a liquidity crisis.

At best, Plaintiffs argue that the statements made by the Individual Defendants created the broader narrative that the Company was self-funding and did not need external capital. However, "Plaintiffs' subjective interpretation or opinion . . . cannot support their claims." *Davison v. Ventrus Biosciences, Inc.*, No. 13 Civ. 3119 (RMB), 2014 WL 1805242, at *8 (S.D.N.Y. May 5, 2014). Without affirmative statements from any of the Individual Defendants that Farfetch was self-funding and did not need external capital, Plaintiffs face an uphill battle to prove their claims.

*a. Omissions*

The Individual Defendants argue that they had no duty to disclose Project Athena because it was an "unconsummated transaction[]." Doc. 80 at 23 n.8. Plaintiffs argue that they did have a duty to disclose Project Athena because it was a deliberate strategic initiative intended to "raise capital through privatization or asset sales." Doc. 83 at 22. Plaintiffs assert that the duty arose because Farfetch assured investors of its "financial self-sufficiency while secretly pursuing the opposite." *Id.*

There are two actionable theories under Section 10(b) and Rule 10b-5 of the Exchange Act: (1) an actual statement that is "untrue outright," and (2) a half-truth, which is a representation that states the truth only so far as it goes, while omitting critical qualifying information. *Gimpel v. The Hain Celestial Group, Inc.*, 156 F.4th 121, 138 (2d Cir. 2025). A classic example of a half-truth is "the seller who reveals that there may be

two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property." *Universal Health Services, Inc. v. United States*, 579 U.S. 176, 188–89 (2016). Another example is when a child ate a whole cake but only told his parents that he "had dessert." *Gimpel*, 156 F.4th at 138 n.11 (quoting *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264 (2024)).

An omission is actionable only when the company is subject to a duty to disclose the omitted facts. *See In re Time Warner Inc. Securities Litigation*, 9 F.3d 259, 267 (2d Cir. 1993). The mere omission of material information, without a duty to disclose, is not actionable under Section 10(b) and Rule 10b-5. *Macquarie*, 601 U.S. at 266. But once a company speaks on a subject matter, it assumes a duty to make both accurate and complete statements, so they are not misleading when considering the circumstances in which they were made. *Gimpel*, 156 F.4th at 138–39. However, a company does not have a duty to disclose that it is contemplating a transaction. *In re Miniso Group Holding Limited Securities Litigation*, No. 22 Civ. 9864 (ER), 2026 WL 879334, at *14 (S.D.N.Y. Mar. 31, 2026) (citing *In re Centerline Holding Co. Securities Litigation*, 380 F. App'x 91, 94 (2d Cir. 2010)) (finding no affirmative duty to disclose future plans when the omission did not render other affirmative statements misleading); *see Actio v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (finding no duty to disclose negative consequences from a failed factory inspection where it was not a "foregone conclusion" that consequences would materialize). Specifically, a company is not required to disclose that it "considered a take-private transaction, among other potential transactions . . . ." *Kraft v. Third Coast Mistream*, No. 19 Civ. 9398 (LJL), 2021 WL 860987, at *18 (S.D.N.Y. Mar. 8, 2021).

Furthermore, discussing a topic "d[oes] not trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge regarding [it]." *In re Morgan Stanley Information Fund Securities Litigation*, 592 F.3d 347, 366 (2d Cir. 2010). Plaintiffs allege that Farfetch had a duty to disclose Project Athena because of the

Individual Defendants' "decision to speak about the very subject those discussions contradicted." Doc. 83 at 22. But, as discussed, Plaintiffs fail to show how Project Athena contradicts the affirmative statements the Individual Defendants made. Pursuing a take-private transaction does not necessarily mean a company is in a liquidity crisis.

Plaintiffs argue that when a company pursues a "formal strategic process . . . 'it may come under an obligation to disclose other approaches to reaching the goal.'" *Id.* at 21 (quoting *In re Time Warner*, 9 F.3d at 268). However, *In re Time Warner* is factually distinct because the Second Circuit determined a company had a duty to disclose when it "embarked on a highly publicized campaign" about its business strategy and then privately pursued, and ultimately enacted, an entirely different strategy. *In re Time Warner*, 9 F.3d at 262.[6] Plaintiffs argue that Project Athena, paired with the Individual Defendants' statements, is analogous to the facts of *In re Time Warner*, Doc. 83 at 21, but it is unclear what business strategy Farfetch was publicly pursuing with which Project Athena is supposedly inconsistent. Plaintiffs' core allegation is that the Individual Defendants stated that Farfetch was "self-funding and did not need external capital" while secretly pursing Project Athena, *id.* at 8, not that Farfetch publicly claimed that it was pursuing a specific business strategy and then privately engaged in a different strategy. As such, Plaintiffs fail to allege that Farfetch had a duty to disclose Project Athena.

Without establishing a duty to disclose, Plaintiffs' arguments about why the omission of Project Athena would be material to a reasonable investor, *id.* at 23, are moot. *See Macquarie*, 601 U.S. at 265 ("Silence, absent a duty to disclose, is not

---

[6] *In re Time Warner* is also distinguishable because the court relied on *Conley*'s now outdated standard, holding that a court should "permit a complaint to survive dismissal unless . . . 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *In re Time Warner*, 9 F.3d at 263 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957)). But the Supreme Court has clarified that district courts should dismiss a complaint if it is not "plausible on its face." *Twombly*, 550 U.S. at 570.

misleading under Rule 10b–5." (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988))). Plaintiffs have failed to sufficiently allege an actionable omission theory.

*b. Non-Actionable Forward-Looking Statements*

The Individual Defendants argue that the statements Plaintiffs point to are "quintessential forward-looking statements," which are not actionable because they fall under the PSLRA's safe harbor provisions. Doc. 80 at 17–18. To support this point, the Individual Defendants argue that each of the statements were identified as forward-looking, included meaningful cautionary language, and noted risk factors that could alter the projections. *Id.* at 18–20. Plaintiffs contend that the misrepresentations and omissions do not fall under the PSLRA's safe harbor provisions because (1) they discussed current conditions, and (2) the cautionary language warned of the possible need for future financing, while Project Athena reveals that Farfetch was actively pursuing financing in the present. Doc. 83 at 16–18.

The PSLRA's safe harbor provision provides that no liability attaches to a forward-looking statement if it is (1) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements," (2) "immaterial," or (3) "the plaintiff fails to prove that [it] . . . was made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1). The Second Circuit has held that statements are forward-looking if the speaker uses linguistic cues to suggest the statement is forward-looking when they are accompanied by an explanation that the company intends to make forward-looking statements. *Slayton v. American Express Co.*, 604 F.3d 758, 769 (2d Cir. 2010). For example, statements about a company's upcoming goals are forward-looking statements protected by the PSLRA, *see In re Adient plc Securities Litigation*, No. 18 Civ. 9116 (RA), 2020 WL 1644018, at *18 (S.D.N.Y. Apr. 2, 2020), as are statements about a company's expected "ability to raise cash and maintain a cash balance sufficient to fund continued investments," *Jones v. Perez*, 550 F. App'x 24, 27 (2d Cir. 2013).

"To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton*, 604 F.3d at 772; *see Villare v. Abiomed, Inc.*, No. 19 Civ. 7319 (ER), 2021 WL 4311749, at *18 (S.D.N.Y. Sep. 21, 2021) (explaining that "forward-looking" statements are not actionable where "cautionary language warn[ed] of the very risks that [plaintiff] alleges that [d]efendants failed to disclose"). If plaintiffs argue that the forward-looking statement was made with knowledge of its falsity, pursuant to the third prong of the statute, they "must state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Slayton*, 604 F.3d at 773 (internal quotations and citations omitted). Not only must plaintiffs "plead facts to support a *strong* inference of scienter," which is "cogent and at least as compelling as any opposing inference of nonfraudulent intent," but "the scienter requirement for forward-looking statements is stricter than for statements of current fact" because it cannot rely on recklessness but only "knowing falsity." *Id.* (internal quotations and citations omitted).

Plaintiffs contend that the statements are not forward-looking, precluding the PSLRA's safe harbor provision altogether, because they allege that the "assurances of Farfetch's sufficient liquidity and self-funding communicate current conditions, not future expectations." Doc. 83 at 16.[7] Plaintiffs, without pointing to specific statements, cite paragraphs 96–110 of the SAC to support this proposition. *Id.* Many of the statements in this section come from Farfetch's Capital Markets Day. ¶¶ 97–103. On that occasion, Neves represented that he expected Farfetch "to continue on a path of growth, profitable growth and cash flow generation." ¶ 97. Jordan stated: "[W]e have clear visibility that

---

[7] Plaintiffs also note that a statement may contain both forward-looking and non-forward-looking statements, which are severable for this analysis. Doc. 83 at 16 (quoting *Iowa Public Employees' Retirement System v. MF Global, Limited*, 620 F.3d 137, 144 (2d Cir. 2010)). However, Plaintiffs do not point to any statement that can or should be severed. *Id.*

we will deliver not only growth, but sustained profitability and positive free cash flow moving forward." ¶ 101. Plaintiffs allege that the Capital Markets Day event created the false impression that Farfetch was committed to achieving profitability and free cash flow through organic growth of existing investments. ¶ 103. Despite this allegation, Plaintiffs fail to argue why these statements are not forward-looking. Also, at the start of Capital Markets Day, the introductory speaker stated:

> We will also be making forward-looking statements today. Actual results could differ materially from those forward[-looking] statements, and we undertake no obligation to publicly update or revise them. For a discussion of some of the factors that could cause actual results to differ from these forward-looking statements, please refer to our SEC filings. We will also refer to certain non-IFRS financial measures. You can find reconciliations of these measures to the most directly comparable IFRS financial measures in the slide presentations, which will be available at farfetchinvestors.com.

Doc. 81-8 at 5. This statement along with the linguistic cues, such as "moving forward," ¶ 101, and "continue on a path," ¶ 97, provide sufficient grounds to conclude that these were forward-looking statements accompanied by meaningful cautionary language. *See In re BHP Billiton Limited Securities Litigation*, 276 F. Supp. 3d 65, 84 (S.D.N.Y. 2017) (determining that "a disclaimer identifying the type of statement [the defendant] made as forward-looking and warning investors that actual results could differ from projected results" were "sufficiently meaningful" cautionary statements).

Plaintiffs also allege that the Individual Defendants made materially false, non-forward-looking statements during an investor call discussing Q4 2022. ¶¶ 104–105. During this call, Neves stated that Farfetch was "an even stronger and more efficient organization" and that he was "more confident than ever" about the Company's "prospects to deliver growth, profitability and positive free cash flow in 2023 and beyond." ¶ 104. Phair stated: "The work we've done throughout 2022 and the years prior, investing in our customer and in our partnerships with brands and boutiques puts us in a strong position to deliver on our 2023 goals." ¶ 105. At the outset of this call,

Farfetch provided a statement that is substantially the same as the one made on Capital Markets Day, cautioning that some of the statements were forward-looking. Doc. 81-10 at 5 ("Before we begin, we would like to remind you that our discussions today will include forward-looking statements. Actual results could differ materially from those indicated in the forward-looking statements, and forward-looking statements made today speak only to our expectations as of today.").

Additionally, Plaintiffs point to the FY 2022 Form 20-F financial report, in which Farfetch stated, "We believe that our sources of liquidity and capital will be sufficient to meet our business needs for at least the next twelve months. We also expect these sources of liquidity will be sufficient to fund our long-term contractual obligations and capital needs." ¶ 106. Likewise, this statement was preceded by a detailed cautionary statement, identifying the remarks as forward-looking. Doc. 81-12 at 11 ("This Annual Report contains statements that constitute 'forward-looking statements' within the meaning of the [PSLRA]. We intend such forward-looking statements to be covered by the safe harbor provisions . . . . These statements are neither promises nor guarantees, but involve known and unknown risks . . . that may cause our actual results, performance or achievements to be materially different . . . .").

Plaintiffs further allege that on May 18, 2023, in the Q1 2023 Earnings Release, Jordan stated that the Company "delivered what [it] set out to achieve . . . . [It has] successfully navigated through unprecedented macro challenges, and through continued focused execution, [it] remain[s] on track to deliver a year of luxury market-beating growth, a return to profitability and positive free cash flow." ¶ 107. Once again, this Release was accompanied by an extensive cautionary statement identifying some of the language as forward-looking. Doc. 81-16 at 18 ("This release contains forward-looking statements within the meaning of the [PSLRA]. . . . These statements are neither promises nor guarantees, but involve known and unknown risks, uncertainties and other important factors that may cause actual results . . . to be materially different from any

future results, performance or achievements expressed or implied by the forward-looking statements . . . ."). For the same reasons as above, these statements satisfy the first prong of the PSLRA's safe harbor provision, protecting the forward-looking statements that are "identified as a forward-looking statement, and [are] accompanied by meaningful cautionary statements." 15 U.S.C. § 78u–5(c)(1).

Plaintiffs next argue that even if the statements were accompanied by cautionary language, they still do not fall under the PSLRA's safe harbor because they allege that the existence of Project Athena reveals that the Individual Defendants knew these statements to be false. Doc. 83 at 16–17. Specifically, Plaintiffs contend that the Individual Defendants' disclosures that Farfetch may need future financing was contradicted by their "*present* capital-raising efforts." *Id.* at 17. The Individual Defendants argue that the pleadings do not adequately allege that they had "'actual knowledge' their statements were false." Doc. 84 at 8 (quoting *Slayton*, 604 F.3d at 773). Specifically, they contend that the allegations do not bring forth new information contradicting the statements, and so the Court should reject their claims as it had in its first opinion dismissing the CAC. Doc. 80 at 21.

Plaintiffs argue that the SAC, which now discusses Project Athena, reveals that Farfetch was facing a liquidity crisis, rendering the positive statements made by the Defendants false. Doc. 83 at 13; ¶¶ 144–86. In order to succeed on this argument, Plaintiffs must "plead facts to support a *strong* inference of scienter," which is "cogent and at least as compelling as any opposing inference of nonfraudulent intent," and they cannot rely on recklessness but only "knowing falsity." *Slayton*, 604 F.3d at 773 (internal quotations and citations omitted). The Court must take into account all of the facts alleged, the documents incorporated into the SAC, and plausible opposing inferences. *Id.* at 774 (citing *Tellabs*, 551 U.S. at 322–23). Plaintiffs rely on their contention that the Individual Defendants knew about Project Athena, Doc. 83 at 17, but knowledge of a capital-raising effort does not render any of the statements the Individual Defendants

made false. The existence of Project Athena does not necessarily mean that the Individual Defendants knew Farfetch was a failing business. Nor does the SAC sufficiently allege that the Individual Defendants stated that Farfetch did not need any external capital, so Project Athena does not render the statements false.[8]

The Individual Defendants note that throughout this time, they increased their stockholdings, Docs. 81-3 at 117, 81-12 at 121, 81-22 at 6, which is inconsistent with an inference that the Individual Defendants knew Farfetch was failing and that their statements about its financial well-being were false, *see Turner v. MagicJack VocalTec, Limited*, No. 13 Civ. 448 (RWS), 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) (finding that purchasing stock during the relevant period rebuts an inference of scienter). Plaintiffs have failed to allege facts that provide a "cogent" inference of scienter which is "as compelling as any opposing inference." *Slayton*, 604 F.3d at 773 (internal quotations and citations omitted). Therefore, Plaintiffs fail to allege that the Individual Defendants' forward-looking statements were made with knowledge of their falsity. These statements fall within the PSLRA's safe harbor and are non-actionable.

*c. Non-Actionable Opinion Statements*

The Individual Defendants contend that all of the challenged statements in the SAC are non-actionable opinions. Doc. 80 at 24. Plaintiffs do not specify which statements are not opinions, but (1) argue that a statement fails to be a non-actionable opinion when the speaker knew of contradicting material facts, and (2) point to *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575

[8] The Individual Defendants also argue that a letter authored by outside counsel for Surpique cannot serve to establish that the Individual Defendants knew the statements they made were false. Doc. 80 at 22–23. Although Plaintiffs argue that the evidentiary weight of the letter should not be determined on a Rule 12 challenge, Doc. 83 at 14, this Court determines that these statements are insufficient to allege that the Individual Defendants knew their statements were false when they were making them. *See Wilbush v. Ambac Financial Group, Inc.*, 271 F. Supp. 3d 473, 497 (S.D.N.Y. 2017) ("[T]he law is abundantly clear that" in cases where the witnesses had no contact with the Individual Defendants, their "allegations are insufficient to support scienter.") (internal quotations and citations omitted). Since the outside counsel drafted this letter after the alleged events occurred and have no direct connection to any of the Individual Defendants, it cannot adequately support allegations of knowing falsity as to the statements made.

U.S. 175 (2015), to contend that the opinions are actionable statements. Doc. 83 at 18–19. In *Omnicare*, the Supreme Court determined that an opinion statement is actionable if either (1) the speaker did not hold the belief she professed, (2) the supporting fact she supplied were untrue, or (3) the speaker omits information whose omission makes the statement misleading to a reasonable investor. 575 U.S. at 186, 194. Plaintiffs focus on the third prong, arguing that the Individual Defendants' statements were misleading because they pursued Project Athena while stating that the Company had sufficient liquidity and did not need capital. Doc. 83 at 19. Defendants contend that this argument fails because (1) it relies on the false conclusion that Project Athena "is synonymous with the liquidity crisis that emerged in late 2023" and (2) Farfetch's disclosures are consistent with Project Athena, Doc. 84 at 9–10, and additionally, Plaintiffs cannot show that the statements fall under any of the *Omnicare* prongs, Doc. 80 at 25–26.

The Supreme Court cautioned against an overly expansive reading of this standard, stating that "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts," and a "reasonable investor does not expect that *every* fact known to an issuer supports its opinion statement." *Omnicare*, 575 U.S. at 189–90. Accordingly, an opinion statement "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" *Id.* at 189. Moreover, the Supreme Court has emphasized that "the investor takes into account the customs and practices of the relevant industry. So an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Id.* at 190; *see In re Aratana Therapeutics Inc. Securities Litigation*, 315 F. Supp. 3d 737, 755 (S.D.N.Y. 2018) ("[T]he Supreme Court has emphasized[] statements of opinion must be considered in the context in which they arise.").

First, Plaintiffs have failed to sufficiently allege that the Individual Defendants made any statement while knowing of its falsity and failed to show why the existence of

Project Athena renders the statements of the Individual Defendants false. Therefore, Plaintiffs' first argument fails. The existence of Project Athena, even when considered in conjunction with the Individual Defendants' public statements, does not sufficiently suggest that they had fraudulent intent. Plaintiffs also fail to adequately show why the pursuit of Project Athena makes the Individual Defendants' opinion statements false.

Second, Plaintiffs have failed to adequately plead that Farfetch had a duty to disclose the existence of Project Athena, so they also fail on *Omnicare*'s third prong. Without any duty to disclose, the Individual Defendants cannot be held liable for an omission. *See Macquarie*, 601 U.S. at 265. Plaintiffs' theory that the omission was misleading also relies on the notion that the Individual Defendants said that Farfetch had sufficient liquidity and did not need external capital, which they have not adequately alleged.

*d. Non-Actionable Corporate Optimism or Puffery*

The Individual Defendants argue that many of the statements in the SAC are non-actionable puffery because the statements are too general and "are [not] framed as guarantees" or "tethered to specific, verifiable facts." Doc. 80 at 26–27. Plaintiffs argue that the Individual Defendants' repeated assurances "that Farfetch had sufficient liquidity, was self-funding, and did not need to raise capital," are not mere puffery because they convey material, present facts about the Company. Doc. 83 at 19. Plaintiffs point to the statement that Farfetch "has sufficient liquidity for the next 12 months [which they argue] necessarily represents that it has sufficient liquidity" in the present. *Id.* at 20. This and similar statements, Plaintiffs contend, are assertions about the Company's current financial condition and are misleading because of the "contemporaneous pursuit of Project Athena." *Id.* The Individual Defendants reassert their contention that none of the statements in the SAC were "'concrete representations' that Farfetch '*was* self-funding, and *did not need* external capital.'" Doc. 84 at 10–11 (quoting Doc. 83 at 19–20).

For a statement to be actionable, "the representation must be one of existing fact, and not merely an expression of opinion, expectation or declaration of intention." *In re Duane Reade Inc. Securities Litigation*, No. 2 Civ. 6478 (NRB), 2003 WL 22801416, at *4 (S.D.N.Y. Nov. 25, 2003) (quoting *Greenberg v. Chrust*, 282 F. Supp. 2d 112, 121 (S.D.N.Y. 2003), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x. 250 (2d Cir. 2004). "Generalized statements regarding a company's fiscal discipline and risk management amount to no more than inactionable puffery." *In re New York Community Bancorp, Inc., Securities Litigation*, 448 F. Supp. 2d 466, 480 (E.D.N.Y 2006) (citing *In re JP Morgan Chase Securities Litigation,* 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005)).

However, "[s]tatements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *In re International Business Machines Corporate Securities Litigation*, 163 F.3d 102, 107 (2d Cir. 1998) (internal citations omitted); *see also Gissin v. Endres*, 739 F. Supp. 2d 488, 502 (S.D.N.Y. 2010) ("[S]tatements are not protected where defendants had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality." (internal quotations omitted)).

As in the previous opinion of this Court, the statements to which Plaintiffs point are not actionable. Statements about a company being "back to growth" are not sufficiently specific or concrete to mislead reasonable investors. *See Villare*, 2021 WL 4311749, at *15; *Gissin*, 739 F. Supp. 2d at 511–12 (finding the defendant's statement that the company "continues to maintain a strong balance sheet" was mere puffery because it did not "offer any of the 'long-term guarantees' or specifics which would convert an opinion or projection into a factual misrepresentation"); *Livingston v. Cablevision Systems Corp.*, 966 F. Supp. 2d 208, 220 (E.D.N.Y. 2013) (finding a statement that a company "'can continue to provide superior products, superior customer service, and compete aggressively, and continue to grow' is quintessential inactionable

puffery"). Therefore, the Individual Defendants' statements such as Farfetch had "all the key elements to execute on [its] plan" and "[t]he work we've done . . . puts us in a strong position to deliver on our 2023 goals," ¶¶ 157–58, constitute non-actionable puffery.

Plaintiffs argue that Farfetch's claim that it will have "sufficient liquidity for the next 12 months" implies that it presently had sufficient liquidity, which is specific and misleading. Doc. 83 at 20. The only thing Plaintiffs argue makes this misleading is the existence of Project Athena. *Id.* Once again, Plaintiffs fail to adequately explain why the existence of Project Athena necessarily means that a statement that Farfetch has sufficient liquidity in the present, or for the next 12 months for that matter, is misleading. Also, as the Individual Defendants argue, nowhere in the SAC do the Individual Defendants claim that Farfetch was self-funding and did not need external capital. *See* Doc. 78. The Court need not answer whether this challenged statement is specific enough not to qualify as puffery because it is primarily a projection about the future, was qualified by "[w]e believe," and was accompanied by cautionary language. ¶ 106; *see* 15 U.S.C. § 78u–5(c)(1) (stating that the PSLRA's safe harbor provision provides that no liability attaches to a forward-looking statement if it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements").

Accordingly, Plaintiffs have failed to adequately allege that the Individual Defendants made materially misleading statements or omissions.

2. *Plaintiffs Do Not Allege a Strong Inference of Scienter*

The Individual Defendants assert that Plaintiffs have not sufficiently pleaded a cognizable motive or the requisite "correspondingly greater" showing of "conscious misbehavior or recklessness," when motive is absent. Doc. 80 at 29–30. They argue that Plaintiffs did not show any concrete benefit that the Individual Defendants received, fail to allege motive, and did not point to facts showing they were aware that their statements were, or that there was a good chance that they were, false or misleading, failing to allege conscious misbehavior or recklessness. *Id.* Plaintiffs argue that they have adequately

alleged scienter because they allege that the Individual Defendants were "directly involved" in Project Athena, to raise capital or sell the business, while stating that "Farfetch was self-funding and did not need external capital." Doc. 83 at 24. They contend that the Individual Defendants, through their positions, each had direct involvement in Project Athena and had a "concrete motive . . . to stave off bankruptcy and maintain its credit access long enough to complete Project Athena." *Id.* at 24–25.

To satisfy the PSLRA's pleading requirements for scienter, a plaintiff must allege facts with particularity that would give "rise to a strong inference that the defendant acted with the required state of mind." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (quoting 15 U.S.C. § 78u–4(b)(1), (2)). A strong inference that a defendant acted with a certain intent is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

This inquiry goes beyond the ordinary Rule 9(b) framework and requires courts to consider "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.* "The relevant inquiry for the Court 'is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any *individual* allegation, scrutinized in isolation, meets that standard.'" *In re Magnum Hunter Resources Corp. Securities Litigation*, 26 F. Supp. 3d 278, 299 (S.D.N.Y. 2014) (quoting *Tellabs*, 551 U.S. at 322–23).

A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006). Typically, "ordinary motives possessed by virtually all corporate insiders" are insufficient to plead scienter. *In re Plug Power, Inc. Securities Litigation*, No. 21 Civ. 2004 (ER), 2022 WL 4631892, at *12 (S.D.N.Y. Sep. 29, 2022).

*a. Plaintiffs' Allegations of Motive are Insufficient*

Plaintiffs argue that Farfetch had a clear motive: "to stave off bankruptcy and maintain its credit access long enough to complete Project Athena." Doc. 83 at 25. The Individual Defendants argue that this allegation is insufficient because those two desires are held by virtually all businesses and, therefore, do not adequately allege a fraudulent motive. Doc. 84 at 12.[9] The Individual Defendants argue that Plaintiffs thus failed to allege a clear benefit obtained by them from the alleged fraud and also failed to contend with the fact that each of them increased or retained their stock holdings during the Class Period. Doc. 80 at 29.

The basis of Plaintiffs' allegation is that the Individual Defendants pursued an initiative "to raise capital," while telling investors they didn't need capital, establishing scienter. Doc. 83 at 24. But, "courts in this district have generally found allegations regarding the desire to raise capital inadequate to plead scienter." *In re Plug Power*, 2022 WL 4631892, at *12. The existence of Project Athena does not create a strong inference that the Individual Defendants acted with fraudulent intent when they made public statements about Farfetch's financial well-being. Plaintiffs argue that the Company's motive was to "stave off bankruptcy and maintain its credit access," which they contend "is a specific allegation that the fraud enabled a specific transaction." Doc. 83 at 25–26. However, courts have found that an allegation that the defendants acted to "avoid bankruptcy" is insufficient because it is a motive common to all corporations. *Saraf v. Ebix, Inc.*, No. 23 Civ. 1182, 2024 WL 1298246, at *2 (2d Cir. Mar. 27, 2024). Courts have also found allegations that a company "wanted to maintain the appearance of profitability and access to capital" are insufficient to allege scienter. *Harris v. AmTrust*

[9] Plaintiffs also contend, "[t]he SAC alleges that Farfetch needed to preserve its relationship with J.P. Morgan, which was simultaneously advising on Project Athena and providing credit facilities, to fund operations through the completion of the undisclosed transaction." Doc. 83 at 25 (citing Doc. 78 ¶ 109). However, (1) the SAC does not make this allegation, merely discussing a credit agreement between Farfetch and J.P. Morgan, Doc. 78 ¶ 109, and (2) Plaintiffs fail to explain how this differs from ordinary motives of a business.

*Financial Services, Inc.*, 135 F. Supp. 3d 155, 177 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).

Plaintiffs contend that "[t]his is not a generic allegation" because courts have found that motive is sufficiently established "when a company is in dire need of funds for survival." Doc. 83 at 26 (quoting *Leone v. ASP Isotopes Inc.*, 811 F. Supp. 3d 563, 606 (S.D.N.Y. 2025)); *see also Skiadas v. Acer Therapeutics Inc.*, No. 19 Civ. 6137 (GHW), 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) ("[C]ourts have found allegations of motive adequate where the company's needed to fundraise to survive."). However, in its analysis, this Court must not look to any fact in isolation but must assess "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *In re Magnum*, 26 F. Supp. 3d at 299 (quoting *Tellabs*, 551 U.S. at 322–23). As this Court noted in its discussion of motive in its prior opinion, Doc. 73 at 36, the purchase of stock during the class period rebuts an inference of scienter, *Turner*, 2014 WL 406917, at *11.

Although Plaintiffs do allege that Farfetch was in significant financial distress, ¶ 5, their allegations of motive rely primarily on "ordinary motives possessed by virtually all corporate insiders," *In re Plug Power*, 2022 WL 4631892, at *12. Looking at the alleged facts as a whole, including the increased stockholdings of the Individual Defendants, *see* Docs. 81-3 at 117, 81-12 at 121, 81-22 at 6, Plaintiffs have failed to adequately allege motive.

*b. Plaintiffs' Allegations of Reckless Disregard or "Circumstantial" Scienter are Insufficient*

The Individual Defendants argue that Plaintiffs have failed to allege that they acted with conscious misbehavior or recklessness. Doc. 80 at 30. Plaintiffs further argue that (1) former employee "allegations provide context," (2) the "fraud touched core operations," and (3) "temporal proximity supports scienter." Doc. 83 at 27–28. Defendants argue that these allegations are insufficient to establish scienter, adding that,

since the alleged fraud resulted in the Defendants' "own massive financial losses," the more compelling inference is a non-culpable one. Doc. 84 at 13–14.

When a plaintiff fails to allege a motive to commit fraud, the plaintiff's allegations that indicate a defendant's recklessness "must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotations and citations omitted). Plaintiffs must plead conduct that is "highly unreasonable" or reflects "an extreme departure" from the standards of ordinary care. *Board of Trustees of City of Ft. Lauderdale General Employees' Retirement System v. Mechel OAO*, 811 F. Supp. 2d 853, 869 (S.D.N.Y 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012). Often, this is satisfied by pleading particularized facts that show that the defendants had "knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142. Plaintiffs must identify the specific reports or statements containing the contrary information. *Mechel OAO*, 811 F. Supp. 2d at 869.

Under the "conscious misbehavior or recklessness" prong, to qualify as "strong," the inference of scienter from the facts alleged "must be more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 314. If an inference of fraudulent intent is not "at least as compelling" as a contrary inference, it is inadequate, even in a "close case." *Slayton*, 604 F.3d at 777. "Thus, a complaint which fails to adduce any specific facts supporting an inference of knowledgeable participation in the alleged fraud, will not satisfy even a relaxed standard." *Faulkner v. Verizon Communications, Inc.*, 156 F. Supp. 2d 384, 393 (S.D.N.Y 2001) (internal quotations and citations omitted).

The prior opinion of this Court directly addressed and rejected Plaintiffs' contentions about the former employee allegations and that the fraud touched the Company's core operations. Doc. 73 at 39–41.

In regard to the former employee allegations providing context, "[i]f plaintiffs rely on allegations that the defendants had access to facts contradicting their public statements, plaintiffs must specifically identify the reports or statements containing this

information." *In re General Electric Co. Securities Litigation*, 856 F. Supp. 2d 645, 659 (S.D.N.Y. 2012) (internal quotation marks and citation omitted). The SAC only alleges that one of the former employees, FE5, spoke to any of the Individual Defendants. ¶ 108. "[T]he law is abundantly clear that" in cases where the witnesses had no contact with the individual defendants, their "allegations are insufficient to support scienter." *Wilbush v. Ambac Financial Group, Inc.*, 271 F. Supp. 3d 473, 497 (S.D.N.Y. 2017) (internal quotations and citations omitted). FE5 alleges that in April 2023, Jordan said that major investors may pull their funding because of longstanding internal deficiencies. ¶ 108. As determined by this Court before, this allegation is insufficient to adequately allege scienter. *See* Doc. 73 at 39–40.

Plaintiffs also allege a core operations theory, arguing that the Individual Defendants knew about the alleged omissions because they concerned matters central to Farfetch's business and survival. Doc. 83 at 27. However, as stated in this Court's previous opinion, Doc. 73 at 40–41, the "core operations" theory at most constitutes "supplemental support" for alleging scienter but does not independently establish scienter, *see New Orleans Employees Retirement System v. Celestica, Inc.*, 455 F. App'x. 10, 14 n.3 (2d Cir. 2011) (declining to decide whether the fact that the alleged misrepresentations related to the defendant's "core operations" was sufficient on its own to establish scienter but noting that the concept that "allegations of a company's core operations . . . can provide supplemental support for allegations of scienter, even if they cannot establish scienter independently" has support in the case law); *see also In re Wachovia Equity Securities Litigation*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) ("[T]he Court considers 'core operations' allegations to constitute supplementary but not independently sufficient means to plead scienter."); *Freudenberg v. E*Trade Financial Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) (finding that the plaintiffs adequately pleaded scienter where one of many allegations was that the misstatements concerned the defendants' core operations).

This leaves Plaintiffs' argument that "temporal proximity supports scienter" because Farfetch revealed the existence of Project Athena in December 2023, which was soon after the Individual Defendants made some of the challenged statements. Doc. 83 at 28. "[H]owever, 'courts in this district have held that temporal proximity alone does not raise a circumstantial inference of fraud.'" *In re Supercom Inc. Securities Litigation*, No. 15 Civ. 9650 (PGG), 2018 WL 4926442, at *32 (S.D.N.Y. Oct. 10, 2018) (quoting *Pearlstein v. BlackBerry Limited*, 93 F. Supp. 3d 233, 247 (S.D.N.Y. 2015)). Even when considered together, none of Plaintiffs' allegations provide a strong inference of scienter.

*c. The More Compelling Non-Culpable Inference*

The Individual Defendants contend that "the fact that [they] increased their shares from 2022 to 2023 and retained them to the very end" is inconsistent with any inference that they knew the Company was in severe financial trouble. Doc. 80 at 32. They propose that the more rational inference is that they believed in Farfetch and the statements they made, but, ultimately, the Company failed. Doc. 84 at 14–15. Plaintiffs state that both Jordan and Phair sold shares in August 2023, which was around the first corrective disclosure, and that Neves' activity—moving shares to a holding company—also does not reflect confidence in Farfetch. Doc. 83 at 28–29. Plaintiffs also reassert that the existence of Project Athena develops a strong inference of scienter. *Id.* at 29–30.

Throughout the Class Period, each of the Individual Defendants maintained ownership over a substantial number of shares.[10] While sales of stock "made a short time before a negative public announcement are" suspect, *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999), other factors are also considered, such as "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling," *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 74–75 (2d Cir. 2001) (citing *Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir.

[10] On December 31, 2023, Neves owned 49,876,223 shares. Doc. 81-22. On August 30, 2023, Jordan owned 1,604,185 shares. Doc. 81-20. On August 4, 2023, Phair owned 1,217,283 shares. Doc. 81-19.

2000)). The Individual Defendants state, and Plaintiffs do not dispute, that the Individual Defendants increased their shares from 2022 to 2023, Doc. 80 at 32, which is inconsistent with an inference of fraudulent intent, *see In re Regeneron Pharmaceuticals, Inc. Securities Litigation*, No. 3 Civ. 3111 (RWS), 2005 WL 225288, at * 22 (S.D.N.Y. Feb. 1, 2005) ("It is well settled that such an action—*i.e.*, the purchase of additional company shares during the class period—is inconsistent with an intent to commit fraud."). While Plaintiffs point out that Jordan and Phair both sold shares in August 2023, Doc. 83 at 28, the relevant period is the Class Period from December 1, 2022 to December 17, 2023. ¶ 1. Both Jordan and Phair increased total shares from 2022 and 2023, and the August sales were not hugely significant in comparison to their total shares.[11] *See Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1998), *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999) ("Inferences of scienter can be undermined when [] insiders' sales of stock are offset by even larger stock acquisitions during the relevant time period.").

As the Individual Defendants argue, the more compelling inference is that they "made good faith and accurate disclosures about the many risks Farfetch faced . . . but ultimately succumbed to a downturn in the luxury fashion and e-commerce industry in late 2023." Doc. 80 at 32. The existence of Project Athena does not imply that the Individual Defendants knew Farfetch was going to face a financial crisis, and Plaintiffs accordingly fail to sufficiently allege scienter.

3. *Plaintiffs Have Not Adequately Pleaded Scheme Liability Under Rule 10b-5(a) and (c)*

The Individual Defendants argue that Plaintiffs' scheme liability claim must fail because (1) the SAC does not include a separate count for scheme liability, (2) Plaintiffs fail to sufficiently plead scienter, and (3) the SAC fails to allege deceptive acts beyond

[11] Plaintiffs also argue that since Neves moved his shares into a holding company it implies that he did not have "confidence in Farfetch's prospects," but he retained ownership of over 7 million Class A shares and 42,858,080 Class B shares on December 31, 2023. Doc. 81-22.

the supposed misstatements and omissions. Doc. 80 at 33. Plaintiffs contend that they pleaded a "cohesive, deceptive course of conduct" by alleging that the Individual Defendants pursued Project Athena while simultaneously telling the public that they didn't need to pursue such an initiative. Doc. 83 at 30. They also argue that they sufficiently alleged deceptive conduct that goes beyond the misstatements. *Id.* at 32. The Individual Defendants counter that (1) they never denied any need to raise capital, and (2) the allegation fails to allege any conduct distinct from the misstatements themselves. Doc. 84 at 15.

Scheme liability arises when defendants engage in deceptive conduct in conjunction with deceptive statements. *See SEC v. CKB168 Holdings, Limited*, 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016). To state a claim for scheme liability, a plaintiff must present facts showing "that the defendant (1) committed a manipulative or deceptive act, (2) in furtherance of the alleged scheme to defraud, (3) [with] scienter, and (4) reliance." *Puddu v. 6D Global Technologies, Inc.*, No. 15 Civ. 8061 (AJN), 2021 WL 1198566, at *9 (S.D.N.Y. Mar. 30, 2021) (alteration in original) (quoting *SEC v. Lee*, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010)).

The SAC still fails to meet the pleading requirement for scheme liability. *See In re Teva Securities Litigation*, 512 F. Supp. 3d 321, 337 (D. Conn. 2021) ("Courts rightly insist that a plaintiff who intends to bring a Rule 10b-5 claim based on both misstatement and scheme liability must do so clearly and specifically," typically "in two separate counts.") (citing *In re Smith Barney Transfer Agent Litigation*, 884 F. Supp. 2d 152, 160–61 (S.D.N.Y. 2012)). In any event, Plaintiffs fail to satisfy the four elements required to allege scheme liability. First, Plaintiffs' theory of material misrepresentations and omissions relies on the fact that they made these statements while pursuing Project Athena, which allegedly contradicted the statements, Doc. 83 at 13–23, but Plaintiffs fail to allege a distinctive act of deception or manipulation. "[C]ourts have prohibited plaintiffs from recasting their pleadings in this way." *SEC v. Rio Tinto plc*, 41 F.4th 47,

55 (2d Cir. 2022) (citing *In re Alstom SA*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005)). Second, as discussed above, Plaintiffs have not sufficiently pleaded scienter for the Individual Defendants. Therefore, Plaintiffs' scheme liability claims fail as to that element. *Menaldi v. Och-Ziff Capital Management Group LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017) ("Scheme liability claims are subject to the PSLRA pleading standard with respect to scienter."). Plaintiffs, therefore, have failed to allege two of the elements required to successfully plead a scheme liability claim.

**C. Section 20(a) Liability**

The Individual Defendants argue that "Plaintiffs' Section 20(a) claim fails because the SAC does not plausibly allege a primary violation of Section 10(b) or culpable participation by any Defendant." Doc. 80 at 33. Plaintiffs argue that their claim pursuant to Section 20(a) should not be dismissed because they have adequately alleged primary violations of Section 10(b) and the Individual Defendants do not dispute their status as "Control Persons" over Farfetch. Doc. 83 at 32.

"To assert a *prima facie* case under Section 20(a), a plaintiff 'must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.'" *Mechel OAO*, 811 F. Supp. 2d at 882 (quoting *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)). Because Plaintiffs have failed to allege a primary violation of the Exchange Act, their claim pursuant to Section 20(a) is dismissed. *See Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 368 (S.D.N.Y. 2019), *aff'd sub nom. Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020).

**D. Leave to Amend**

Plaintiffs ask that if the Court dismisses their claims, that it grant them leave to amend their pleadings. Doc. 83 at 32 n.10. The Individual Defendants argue that the

SAC should be dismissed with prejudice because it is Plaintiffs' third attempt to plead a securities fraud claim, after the initial complaint and the consolidated complaint. Doc. 84 at 15. Motions to amend are ultimately within the discretion of the district court judge. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "[A] dismissal with prejudice is generally appropriate where a court puts a plaintiff on notice of a complaint's deficiencies and the plaintiff fails to correct those deficiencies after amendment." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 8 Civ. 7508 (SAS), 2009 WL 3346674, at *2 (S.D.N.Y. Oct. 15, 2009). This Court, in its prior opinion, alerted Plaintiffs to the deficiencies in its allegations of scienter, warned that the statements to which Plaintiffs point were forward-looking, opinions, and mere puffery, and counseled that they needed to plead scheme liability with more specificity. Doc. 73. Despite the addition of allegations about Project Athena, Plaintiffs have failed to remedy these deficiencies. The SAC is therefore dismissed with prejudice.

## IV. CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED with prejudice. The Clerk of the Court is respectfully directed to terminate the motion, Docs. 79 and 82, and close the case.

It is SO ORDERED.

Dated: September 29, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.